## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## TAMPA DIVISION

ERNEST WHITFIELD,

      Petitioner,

v.                                   CASE NO. 8:07-CV-1823-T-30MAP

SECRETARY, DEPARTMENT
OF CORRECTIONS,

      Respondent.

_____/

## ORDER

Petitioner, Ernest Whitfield (hereinafter "Petitioner"), petitions this Court for the writ of habeas corpus, pursuant to 28 U.S.C. § 2254 (Dkt. 1).

### Background and Procedural History

Petitioner was convicted of armed burglary, sexual battery with a deadly weapon, and first-degree murder. He was sentenced to death for the first-degree murder charge (Resp. Ex. A-13 at pp. 2033-34). Petitioner appealed, and on September 11, 1997, the Florida Supreme Court affirmed Petitioner's convictions and sentences. *See Whitfield v. State*, 706 So. 2d 1 (Fla. 1997).

On May 6, 2002, Petitioner filed an amended Rule 3.850 motion (Resp. Ex. C-2 at record pp. 267-322). On March 17, 2004, the circuit court denied Petitioner's amended Rule 3.850 motion (Resp. Ex. C-5 at record pp. 826-883). On November 3, 2005, the Florida

Supreme Court affirmed the denial of Petitioner's amended Rule 3.850 motion. *See Whitfield v. State*, 923 So. 2d 375 (Fla. 2005).

Petitioner filed his federal habeas petition on October 5, 2007 (Dkt. 1). Respondent filed a motion to dismiss the petition as time-barred (Dkt. 13). Petitioner filed a response to the motion to dismiss (Dkt. 20), and Respondent filed a reply (Dkt. 22). On September 18, 2008, an evidentiary hearing was held on the issue of whether Petitioner was entitled to equitable tolling of the one-year limitation period (Dkt. 31). On September 24, 2008, the Court granted Respondent's motion to dismiss and dismissed the petition as time-barred (Dkt. 33).[1]

Petitioner appealed the order dismissing the petition. Both this Court and the Eleventh Circuit Court of Appeals denied Petitioner a certificate of appealability (Dkts. 40, 48). Subsequently, however, the Eleventh Circuit remanded the case to this Court for fact finding and further proceedings consistent with the Supreme Court's decision in *Holland v. Florida*, 130 S.Ct. 2549 (2010) (Dkt. 49).

After further briefing by both parties on the issue of equitable tolling, this Court entered an order vacating the original order dismissing Petitioner's habeas petition as time-barred, and directed Respondent to respond to the petition (Dkt. 59). Respondent filed a response (Dkt. 64), and Petitioner filed a reply (Dkt. 78).

---

[1]Although the Court found that counsels' conduct was grossly negligent, the Court was constrained at that time by *Holland v. State*, 539 F.3d 1334 (11th Cir. 2008) from granting Petitioner's request for equitable tolling. *Holland* held that attorney negligence could never serve as a basis for equitable tolling. The Supreme Court subsequently rejected this view in *Holland v. Florida*, 130 S. Ct. 2549 (2010).

2

Upon consideration of Petitioner's claims, the Court has determined that none has merit and that Petitioner's request for federal habeas relief must be denied.

## **Facts**[2]

In early June 1995, Whitfield went to the home of Claretha Reynolds. He asked Reynolds, Willie Mae Brooks, and Estella Pierre for money. Pierre was Whitfield's former girlfriend. When none of them would give him any money, he tried to snatch Pierre's purse. Reynolds grabbed Whitfield in a headlock and forcibly ejected him from her home. Whitfield told them as he left: "I'm going to kill all three of you bitches."

Several weeks later, in the early morning hours of June 19, 1995, Whitfield attempted to get Willie Mae Brooks to let him in Reynolds' house. Brooks refused and went back to sleep in the bed she shared with her one-year-old child. Whitfield subsequently unlawfully entered Reynolds' home. Armed with an eight-inch knife, he entered the bedroom in which Brooks was sleeping and raped Brooks, indicating that he would stab her and her child if she screamed. Whitfield then went into a different room where Reynolds and her five children were located.  About ten minutes later, Reynolds stumbled into Brooks's room and asked her to lock the door. She was bleeding profusely from her wounds and told Brooks that she was dying and that Ernest had stabbed her. Brooks and one of Reynolds' children, a twelve-year-old, climbed out the window and ran to a neighbor's house to call police. Whitfield fled the scene. Reynolds died shortly after police arrived.

---

[2]The facts are taken from the Florida Supreme Court's opinion affirming Petitioner's convictions on direct appeal. *Whitfield v. State*, 706 So. 2d at 2-3.

After he was apprehended, Whitfield admitted stabbing Reynolds and led police to the murder weapon.

The medical examiner testified that Reynolds was stabbed twenty-one times; seven of the wounds were potentially lethal and many of the wounds were seven inches deep. He further stated that, after Reynolds was stabbed, she was still fully conscious and aware that she was dying.

Whitfield's defense was based on voluntary intoxication by cocaine. A clinical psychologist, Dr. Regnier, testified regarding Whitfield's cocaine abuse and his 1991 Baker Act hospitalization. He stated that Whitfield exhibited symptoms consistent with the classic pattern of cocaine abuse. He further testified that there was no reason to believe that Whitfield was not under the influence of cocaine during the incident and that there was reasonable doubt about premeditation.

The State's psychiatrist, Dr. Sprehe, testified in rebuttal that Whitfield was able to form a specific intent to commit murder, pointing out that Whitfield was arrested within two hours of the incident and was not considered to be intoxicated at that time. Further, he stated that Whitfield's actions during the course of the crimes showed planning ability: he entered the house, obtained a kitchen knife, used the knife to rape Brooks, threatened Brooks not to make noise, entered another room to kill Reynolds, left the house, and disposed of the knife. Dr. Sprehe also stated that cocaine psychosis resulting from long-term use of cocaine does not go away in a matter of hours.

4

Whitfield was convicted of armed burglary, sexual battery with a deadly weapon, and first-degree murder.  During the penalty phase, evidence was admitted regarding Whitfield's prior aggravated battery convictions. Testimony was presented that during both of the prior aggravated batteries Whitfield threatened to kill the victims if they called police. Whitfield presented evidence to show that he had recently been shot and severely wounded but that he forgave his assailant; that he was chronically dependent on drugs; that he suffers from major depression; that he suffered from a deprived childhood; that he was mentally ill and under the influence of crack cocaine when he entered Reynolds' home; and that he was not in complete control of his emotions at the time of the murder.

The jury recommended death by a seven-to-five vote. The trial judge followed the jury's recommendation. He found three factors in aggravation: 1) prior violent felonies (two prior aggravated batteries and contemporaneous sexual battery of another victim in this case); 2) the murder was committed in the course of a burglary; and 3) the murder was heinous, atrocious, or cruel. He found no statutory mitigating circumstances, but he found the following nonstatutory circumstances: cooperation with authorities (little or no weight); impoverished background (considerable weight); crack cocaine addiction (substantial weight); Whitfield's abandonment by his father and his mother's alcoholism (some weight); and that Whitfield was the victim of a near fatal shooting but forgave his assailant (little or no weight).

## Standards of Review

**A.    AEDPA**

Because Petitioner filed his petition after April 24, 1996, this case is governed by 28 U.S.C. § 2254, as amended by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"). *Penry v. Johnson*, 532 U.S. 782, 792 (2001); *Maharaj v. Sec'y of Dept. of Corrections*, 304 F.3d 1345, 1346 (11th Cir. 2002). The ultimate issue with respect to each claim is whether the Florida Supreme Court's resolution of the claim was "contrary to, or involved an unreasonable application of, clearly established Federal law as determined by the Supreme Court of the United States, or resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d). *Williams v. Taylor*, 529 U.S. 362 (2000); *Robinson v. Moore*, 300 F.3d 1320 (11th Cir. 2002); *Van Poyck v. Florida Department of Corrections*, 290 F.3d 1318 (11th Cir. 2002). The standard Petitioner must meet could not be higher; it is not enough that the state court "got it wrong." Petitioner must show that the state court's decision was objectively unreasonable. *Bell v. Cone*, 535 U.S. 685, 694 (2002) (citing *Williams v. Taylor, supra*).

No evidentiary hearing is required because none of Petitioner's claims turn on any unresolved issue of fact.  All involve issues of law argued on the basis of the existing record.[3]

---

[3]The state trial court conducted an evidentiary hearing. Its findings are "presumed to be correct" (28 U.S.C. § 2254(e)(1)) and there is no showing that its decision "was based on an unreasonable determination of the facts. . ." (28 U.S.C. § 2254(d)(2)).

**B.      Ineffective Assistance of Counsel Standard**

To prevail on a claim of ineffective assistance of trial or appellate counsel, a Petitioner must meet the two-part test set forth in *Strickland v. Washington*, 466 U.S. 668 (1984). *Strickland*'s two-part test requires a Petitioner to demonstrate that counsel's performance was deficient and "there was a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.*   However, if a claim fails to satisfy the prejudice component, the court need not make a ruling on the performance component.  *Id*. at 697.

### Procedural Default

A § 2254 petition cannot be  granted unless a petitioner "has exhausted the remedies available in the courts of the State. . . ." 28 U.S.C. 2254(b)(1)(A); *Snowden v. Singletary*, 135 F.3d 732, 735 (11th Cir.1998).  In other words, the state prisoner must give the state courts an opportunity to act on his claims before he presents those claims to a federal court in a habeas petition. *O'Sullivan v. Boerckel*, 526 U.S. 838, 842 (1999). *See also Henderson v. Campbell*, 353 F.3d 880, 891 (11th Cir.2003) ("A state prisoner seeking federal habeas relief cannot raise a federal constitutional claim in federal court unless he first properly raised the issue in the state courts."); *Judd v. Haley*, 250 F.3d 1308, 1313 (11th Cir.2001); *Duncan v. Henry*, 513 U.S. 364 (1995) ("[E]xhaustion of state remedies requires that the state prisoner 'fairly present' federal claims to the state courts in order to give the State the 'opportunity to pass upon and correct alleged violations of its prisoners' federal rights[.]'") (citation omitted).

Under the procedural default doctrine, "if the petitioner has failed to exhaust state remedies that are no longer available, that failure is a procedural default which will bar federal habeas relief, unless either the cause and prejudice or the fundamental miscarriage of justice exception is applicable." *Smith v. Jones*, 256 F.3d 1135, 1138 (11th Cir.2001). "The doctrine of procedural default was developed as a means of ensuring that federal habeas petitioners first seek relief in accordance with established state procedures." *Judd*, 250 F.3d at 1313.

A procedural default will only be excused in two narrow circumstances. First, a petitioner's procedural default may be excused if he demonstrates cause for the default and actual prejudice from the alleged constitutional violation. *Ward v. Hall*, 592 F.3d 1144, 1157 (11th Cir. 2010) (citing *Wainwright v. Sykes*, 433 U.S. 72, 84-85 (1977)).  "To show cause, the petitioner must demonstrate 'some objective factor external to the defense' that impeded his effort to raise the claim properly in state court."  *Id*. at 1157 (quoting *Murray v. Carrier*, 477 U.S. 478, 488 (1986)).  "[I]n order to show prejudice, a petitioner must demonstrate that 'the errors at trial actually and substantially disadvantaged his defense so that he was denied fundamental fairness.'" *Id*. (quoting *McCoy v. Newsome*, 953 F.2d 1252, 1261 (11th Cir. 1992) (per curiam)).  Petitioner must show that there is at least a reasonable probability that the result of the proceeding would have been different. *Henderson*, 353 F.3d at 892.

Second, a petitioner may obtain federal habeas review of a procedurally defaulted claim, without a showing of cause or prejudice, if such review is necessary to correct a fundamental miscarriage of justice. *Edwards v. Carpenter*, 529 U.S. 446, 451 (2000);

8

*Henderson*, 353 F.3d at 892.  This exception is only available "in an extraordinary case, where a constitutional violation has resulted in the conviction of someone who is actually innocent."  *Henderson*, 353 F.3d at 892.

The fundamental miscarriage of justice exception concerns a petitioner's "actual" innocence rather than his "legal" innocence. *Johnson v. Alabama*, 256 F.3d 1156, 1171 (11th Cir.2001) (citing *Calderon v. Thompson*, 523 U.S. 538, 559 (1998)); *Murray v. Carrier*, 477 U.S. at 495-96 (explaining a "fundamental miscarriage of justice" occurs "in an extraordinary case, where a constitutional violation has resulted in the conviction of someone  who is actually innocent").  To meet this standard, a petitioner must "show that it is more likely than not that no reasonable juror would have convicted him" of the underlying offense. *Schlup v. Delo*, 513 U.S. 298, 327 (1995).

"[A] claim of actual innocence must be based on [new] reliable evidence not presented at trial." *Calderon*, 523 U.S. at 559 (quoting *Schlup*, 513 U.S. at 324) ("given the rarity of such evidence, in virtually every case, the allegation of actual innocence has been summarily rejected"). The *Schlup* Court stated the petitioner must show constitutional error coupled with "new reliable evidence—whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence—that was not presented at trial." *Schlup*, 513 U.S. at 324. This fundamental miscarriage of justice exception is not available unless "the petitioner shows, as a factual matter, that he did not commit the crime of conviction." *Ward v. Cain*, 53 F.3d 106, 108 (5th Cir.1995).

**Discussion**

**Ground I**

"THE FLORIDA COURT'S DENIAL OF MR. WHITFIELD'S CLAIM THAT DEFENSE
COUNSEL WAS INEFFECTIVE DURING THE GUILT PHASE OF HIS TRIAL FOR
FAILING TO ADEQUATELY INVESTIGATE AND PRESENT A VOLUNTARY
INTOXICATION DEFENSE TO THE OFFENSE OF FIRST DEGREE MURDER,
BURGLARY AND ARMED SEXUAL BATTERY AND FOR FAILING TO HIRE A
DEFENSE EXPERT IN THE FIELD OF TOXICOLOGY RESULTED IN A DECISION
THAT WAS CONTRARY TO, OR INVOLVED AN UNREASONABLE APPLICATION
OF CLEARLY ESTABLISHED FEDERAL LAW; OR RESULTED IN A DECISION
THAT WAS BASED ON AN UNREASONABLE DETERMINATION OF THE FACTS
IN LIGHT OF THE EVIDENCE PRESENTED." (Dkt. 1 at pgs. 4-18).

In Ground One, Petitioner asserts that at the time of the offense, he was a severe crack

cocaine addict who had been abusing drugs since age fifteen, and cocaine since age

seventeen.  As a result of his cocaine addiction, Petitioner asserts that he suffered brain

damage.  He further asserts that due to his drug use at or near the time he killed the victim,

he was unable to form the requisite intent to commit first-degree murder.  Petitioner argues

that voluntary intoxication was the only viable defense he had, and therefore defense counsel

were ineffective in failing to adequately investigate and present available evidence in support

of the voluntary intoxication defense.  Specifically, Petitioner argues that counsel were

ineffective in failing to: 1) to investigate and call Dinah Giles, Harriet Miller, Evelyn Ford,

and Peggy LaRue to testify at trial to corroborate the voluntary intoxication defense; and 2)

consult with or hire a toxicologist to investigate facts regarding Petitioner's level of

intoxication at the time of the murder.

Petitioner raised this ground in Claims I, II, III, and V of his state Rule 3.850 motion (Resp. Ex. C-2 at record pp. 273-83).   Following an evidentiary hearing, the state post conviction court denied the claim (Resp. Ex. C-5 at record pp. 866-72).   Petitioner also raised this claim in his Initial Brief on appeal from the denial of his Rule 3.850 motion (Resp. Ex. C-15 at pp. 7-35).   In affirming the denial of this claim, the Florida Supreme stated:

### A.     Voluntary Intoxication

Whitfield first claims that trial counsel were ineffective for failing to adequately present a voluntary intoxication defense to first-degree murder, burglary, and armed sexual battery. The defense of voluntary intoxication is only valid for specific intent crimes such as first-degree murder and armed burglary. *See Straitwell v. State*, 834 So. 2d 918, 920 (Fla. 2d DCA 2003) (noting that "[v]oluntary intoxication is a defense to specific intent crimes such as burglary and petit theft"); *Carter v. State*, 801 So. 2d 113, 114 (Fla. 2d DCA 2001) (recognizing voluntary intoxication as a defense to specific intent crimes). The defense is not available for general intent crimes. *See Straitwell*, 834 So. 2d at 920 ("[Voluntary intoxication] is not a defense to general intent crimes such as sexual battery."); *Bland v. State*, 563 So. 2d 794, 795 (Fla. 1st DCA 1990) (recognizing attempted sexual battery as a general intent crime for which the defense of voluntary intoxication is not available). Therefore, the circuit court properly rejected Whitfield's claim of ineffective assistance of counsel for failing to properly present the defense of voluntary intoxication for the crime of sexual battery with a deadly weapon. We address only the claim as it relates to Whitfield's convictions for armed burglary and first-degree murder.

Whitfield argues that trial counsel were ineffective for failing to call four witnesses: Dinah Giles, Harriet Miller, Evelyn Ford, and Peggy LaRue. These witnesses, Whitfield argues, should have been called to corroborate the voluntary intoxication defense. From their testimony at the evidentiary hearing, these witnesses apparently would have testified about Whitfield's history of drug use as well as his impoverished background. Whitfield fails to establish either deficient performance or prejudice, however, as to any of these witnesses.

In denying Whitfield relief on this issue, the circuit court found as follows:

11

> [T]he Court finds that at trial, substantial evidence was presented concerning Whitfield's use of cocaine. The defense accomplished this through the testimony of lay witnesses and Dr. Regnier. Any additional testimony set forth by any of the witnesses, who testified at the evidentiary hearing[,] would have been cumulative.

We have affirmed denials of relief in similar circumstances. In *Cole v. State*, 841 So. 2d 409 (Fla. 2003), for example, the defendant argued that defense counsel was ineffective for failing to call certain witnesses to corroborate his drug abuse problems. *Id*. at 414 n. 3. The circuit court rejected the claim without an evidentiary hearing because, in its opinion, defense counsel had introduced sufficient evidence of Cole's drug use so that "[a]ny additional evidence of drug and alcohol use would have been cumulative of that actually presented." *Id*. at 425. Cole's trial attorneys, like Whitfield's, had produced evidence of Cole's drug abuse through lay witnesses and an expert witness. We affirmed:

> We find no error in the trial court's conclusion that Cole was not entitled to an evidentiary hearing to present what the trial court found would have been cumulative evidence. *See Valle v. State*, 705 So. 2d 1331, 1334-35 (Fla. 1997) (affirming trial court's summary denial of ineffective assistance claim based on allegation that trial counsel failed to present cumulative evidence).

*Id*.

We also faced a similar situation in *Marquard v. State*, 850 So. 2d 417 (Fla. 2002). Marquard claimed ineffective assistance of counsel for failing to call witnesses to testify as to his drug problems and abuse suffered as a child. *Id*. at 429. Defense counsel had introduced this information solely through their expert witness. *Id*. We agreed with the circuit court's denial of the claim:

> Although other witnesses could have provided more details relative to Marquard's early life, counsel is not required to present cumulative evidence. Accordingly, we do not find that Marquard's counsel was ineffective in his representation.

*Id.* at 429-30 (citing *Maharaj v. State*, 778 So. 2d 944, 957 (Fla. 2000) ("Failure to present cumulative evidence is not ineffective assistance of counsel.")).

According to our precedents, therefore, trial counsel have significant leeway in determining how to present such evidence. In Whitfield's case, defense counsel presented significant evidence of Whitfield's drug use problems through several witnesses, including their expert witness, Dr. Regnier, police officers, and lay witness Estella Brooks Pierre. Pierre had been in a relationship with Whitfield in 1995 and for a period the two cohabited. She testified at trial that Whitfield had a drug problem and that she had spoken with him at the time about getting help, but that he never sought rehabilitation. She noted that when he would get paid at work he would disappear for days at a time and that his eyes would enlarge when he was under the influence of drugs. She also testified that after he was shot, the drug problem worsened.

Dr. Regnier testified concerning Whitfield's long history of drug use, including his Baker Act hospitalization. He also testified that he had consulted with family members and acquaintances who described Whitfield's drug use as well as his demeanor while under the influence. Dr. Regnier believed that Whitfield's paranoid disposition was the result of his cocaine use. Finally, Dr. Regnier concluded that he believed Whitfield "was under a lot of cocaine" on the day of the murder.

Defense counsel questioned a police officer on cross-examination about Whitfield's words and actions when he was arrested. The officer testified that Whitfield told him that he had smoked as much as $ 500 worth of crack cocaine on the eve of the crime. Another officer testified that Whitfield told him upon his arrest that he had "smoked a large amount of cocaine the night before."

Having presented this testimony, trial counsel made a strategic decision not to call additional witnesses. Counsel cannot be held ineffective for these strategic decisions: "Strategic decisions do not constitute ineffective assistance if alternative courses of action have been considered and rejected." *Rutherford v. State*, 727 So. 2d 216, 223 (Fla. 1998) (quoting *State v. Bolender*, 503 So. 2d 1247, 1250 (Fla. 1987)).

Whitfield argues that trial counsel nevertheless should have presented the testimony of Dinah Giles, Harriet Miller, Evelyn Ford, and Peggy LaRue. But trial counsel either considered and rejected calling these witnesses or could not

13

have known about them. Moreover, their testimony would have been cumulative to what was presented.

As to Giles, trial counsel Williams, now Judge Williams, testified at the evidentiary hearing that he knew who Giles was, interviewed her, had her interviewed by his expert Dr. Regnier, and made a conscious choice not to call her to the stand. Ms. Syprett, [FN3] co-counsel along with Judge Williams, testified as follows regarding the decision not to present Giles or Whitfield's mother:

> [T]hey were not good historians, they were inarticulate, and the real problem with them was that they were, what I call malleable. I mean they would say one thing but it would have been very easy for a prosecutor to take what they have said and have them unsay it in the cross-examination. So we did not feel confident or comfortable in relying upon them as our star witnesses in the guilt phase.
>
> The other thing is, you know, we know the jury pools that we get in Sarasota County, and they were not what I would call sympathetic witnesses, they would not have helped Mr. Whitfield. They were well intentioned, they wanted to help Mr. Whitfield, but I believed--we believed that Dr. Regnier could present the exact same information in a much more articulate, convincing, firmer manner that would hopefully persuade the jury.

Trial counsel clearly considered alternative means of proceeding and in their professional judgment decided not to call Giles to the stand.

> [FN3] At the time of Whitfield's trial, Ms. Syprett's last name was Scott.

As to Harriet Miller, Judge Williams testified at the evidentiary hearing that he knew of Miller and decided not to call her as a witness because of Whitfield's prior conviction for a violent crime against her. Trial counsel considered the possibility of calling Miller but decided that the potential negative impact of Miller as a witness outweighed any useful testimony she might provide. Furthermore, Miller's testimony would have provided the prosecution a potential opportunity to explore Whitfield's violent tendencies. *See Medina v. State*, 573 So. 2d 293, 298 (Fla. 1990) (finding no ineffective

14

assistance of counsel where proposed testimony would have revealed information that "would have shown [defendant's] violent tendencies").

As to Evelyn Ford, Judge Williams could not recall ever hearing her name from Whitfield. The circuit court found that "Whitfield did not provide this name to his defense attorneys, and further he has failed to demonstrate any prejudice in his attorneys' failure to call her as a witness." As is the case with Giles's testimony, Ford's testimony would have been cumulative. Furthermore, Ford's testimony, like Miller's, would have had the further liability of opening up for exploration Whitfield's violent tendencies. *See id.* [FN4]

> [FN4] Ford testified that when under the influence of drugs, Whitfield had broken a window in his mother's home and punched his stepfather.

Finally, as to Peggy LaRue, she did testify at Whitfield's trial--as a State witness. Among other things, she testified that when she encountered Whitfield on the morning after the murder, he appeared to have big eyes, was talking fast, and looked nervous. She stated that she believed that Whitfield was under the influence of cocaine that morning. LaRue's testimony at the evidentiary hearing added nothing new. Her testimony also would have been cumulative.

Trial counsel made a conscious decision to use Dr. Regnier as their main witness. He was used as a medical expert and also to introduce Whitfield's family medical history and his background into the record. When asked at the evidentiary hearing why they chose Dr. Regnier, Syprett responded that it was a judgment call based on their interviews with the potential witnesses. When asked a similar question, Judge Williams responded as follows:

> A: For a variety of reasons. Number one, I think Dr. Regnier is an excellent psychologist. He has an excellent rapport I think with jurors. Jurors tend to like him. Also, there were issues in terms of the defendant's personalty (sic) that I felt Dr. Regnier would be better able to handle than another psychologist.
> Q: And through Dr. Regnier you were able to in essence, able to get in all of his family background?
>
> A: Yes.

Q: All of his history?

A: Yes.

Q: All the interviews with family members and other persons involved in his life?

A: Yes.

With the testimony of Dr. Regnier, trial counsel obtained a voluntary intoxication jury instruction. According to the circuit court, "the record reveals that the defense requested, and the court gave[,] the voluntary intoxication jury instruction at trial as a defense to first-degree murder and armed burglary." *See also Whitfield*, 706 So. 2d at 2 (stating that Whitfield's defense was based on voluntary intoxication). The circuit court concluded: "Because the voluntary intoxication defense was investigated, presented, and considered by the jury at trial, Whitfield is not entitled to relief." Whitfield has failed to show either prejudice or deficient performance in trial counsel's failure to call additional witnesses.

Whitfield also claims under this issue that trial counsel were ineffective for failing to hire a toxicology expert. As with the failure to present additional witnesses, Whitfield fails to establish prejudice or deficient performance. At the evidentiary hearing, Whitfield presented the testimony of Dr. Mash, an expert in the field of toxicology and the effects of crack cocaine drug abuse on the brain. She testified as to the effects on cognitive function of long-term crack cocaine abuse and commented that a severe addict would have difficulty distinguishing right from wrong. She also testified regarding urine and hair analyses that could have been performed on Whitfield that would have indicated whether he had in fact taken crack cocaine. However, Dr. Mash did not indicate that she would be able to determine Whitfield's exact level of crack cocaine exposure at the time of the murder. Specifically, she stated that had a urine sample been taken on June 21, 1995, [FN5] two days after the crime, the markers in the urine "would be consistent with an individual who had used cocaine, and then depending on the amounts that were in the urine, will give you, again, some indication of the level of use. It's not absolute, as it has been pointed out, as blood is the ultimate measure." [FN6] Further, Dr. Mash opined that Whitfield is a "very severe crack-cocaine addict" and that "[h]is level of dependency on crack-cocaine was very severe and he was dysfunctional, I believe, due to his severe use of crack cocaine."

16

> [FN5] This is the date when Judge Williams was appointed to
> represent Whitfield. Obviously, neither Williams nor Syprett
> could have obtained samples before then.

> [FN6] According to Dr. Mash, to obtain a meaningful measure,
> a blood test needed to be performed within forty-five to ninety
> minutes after Whitfield ingested the cocaine.

Syprett testified at the evidentiary hearing that after her initial meeting with
Whitfield she contacted two different labs about the possibility of determining
his level of intoxication at the time of the murder. Syprett specifically recalled
speaking with a toxicologist about this possibility and was told "it's
nonsensical what you are trying to do." At a pretrial conference, Syprett stated
on the record that upon Whitfield's request that they take a urine sample for
analysis to determine his level of intoxication at the time of the murder, she
"spoke to not one but definitely two and possibly three local authorities" about
the possibility of taking urine samples for this purpose and "was advised that
it wouldn't show what [Whitfield] wanted us to show." Syprett stated that
based on the information she received, she and co-counsel decided "that it was
not going to serve any useful purpose" to take a urine sample and have it
tested.

In denying Whitfield's claim below, the circuit court stated:

> While Whitfield's postconviction motion alleged that Mash would
> provide testimony concerning additional mitigating
> evidence not presented during the penalty phase, the Court finds
> that she did not specifically identify any statutory or
> nonstatutory mitigators that could have been set forth but were
> not. Judge Rapkin further made the following findings
> concerning Whitfield's substance abuse in the final sentencing
> order:

>> "I believe that the defendant is a cocaine addict,
>> and that he probably did use cocaine some time
>> shortly before the murder."

>> "The defendant suffered from chronic crack
>> cocaine addiction."

Dr. Mash's testimony does not establish that trial counsel were ineffective. Trial counsel made a reasonable choice based on available information not to obtain a toxicology expert. Further, Dr. Mash's testimony does not indicate that, had a urine sample been taken, an accurate reading of the level of cocaine in Whitfield's body at the time of the murder would have been established. Her testimony merely confirms what Dr. Regnier's testimony, along with other lay witnesses and police testimony, established at trial--that at the time of the murder Whitfield was under the influence of crack cocaine. The trial court recognized this in its sentencing order. Whitfield cannot establish deficient performance or prejudice on this issue.

*Whitfield v. State*, 923 So. 2d at 379-384.

## A.      Failure to call additional witnesses Giles, Miller, Ford, and LaRue

Petitioner has not challenged the Florida Supreme Court's determination that the circuit court properly rejected Petitioner's claim of ineffective assistance of counsel in failing to properly present the defense of voluntary intoxication for the crime of sexual battery with a deadly weapon.  Accordingly, Petitioner is entitled to no relief with respect to this part of the claim.

With regard to Petitioner's claim of ineffective assistance of counsel in failing to adequately present the defense of voluntary intoxication for the crimes of first-degree murder and burglary, Petitioner first contends that counsel were ineffective in failing to call Dinah Giles (Petitioner's sister), Harriet Miller (Petitioner's former wife), Evelyn Ford (Petitioner's former next-door neighbor), and Peggy LaRue (the sister of Petitioner's former girlfriend). Petitioner asserts that these witnesses' testimony would have supported his voluntary intoxication defense.

18

In affirming the denial of this claim, the Florida Supreme Court concluded that Petitioner failed to establish either deficient performance or prejudice. *Whitfield*, 923 So. 2d at 380. In addressing the deficiency prong of *Strickland*, the Florida Supreme Court found that during the guilt phase of the trial defense counsel presented significant evidence of both Petitioner's history of drug use and use of cocaine on the day of the murder. *Id*. at 380-81. The Florida Supreme Court further found that having presented this testimony, defense counsel made a reasonable strategic decision not to call additional witnesses, and to use Dr. Regnier as their main witness. *Id*. at 381-82.  Finally, the Florida Supreme Court also found that "trial counsel either considered and rejected calling [Giles, Miller, Ford, and LaRue] or could not have known about them." *Id*. at 381.

The Florida Supreme Court also determined that Petitioner failed to show prejudice because Giles, Miller, Ford, and LaRue's testimony was cumulative to the testimony regarding Petitioner's cocaine use presented through the testimony of Dr. Regnier, the police officers, and other lay witnesses. *Id*. at 380-81.  Moreover, the Florida Supreme Court ruled that Petitioner failed to show prejudice because despite failing to call these additional witnesses, defense counsel obtained a voluntary intoxication jury instruction. *Id*. at 382.

During the state post conviction evidentiary hearing, defense counsel testified that after interviewing Petitioner's family members, they decided not to call them as witnesses (Resp. Ex. C-9 at pp. 81; Ex. C-11 at p. 428).  Counsel believed that Giles was "not [a] good historian[,]. . .inarticulate[,]. . .not [a] sympathetic witness[,]. . .[and] would not have helped Mr. Whitfield."  (Resp. Ex. C-11 at p. 428).  Further, counsel were concerned about how

Giles would testify on cross examination (Resp. Ex. C-11 at p. 428).  Counsel "did not feel confident or comfortable in relying upon [Petitioner's family] as our star witnesses in the guilt phase."  (Id.).

Counsel decided not to call Miller because she had been the victim of a violent crime Petitioner had committed against her, and her testimony would have negatively impacted Petitioner's case (Resp. Ex. C-9 at p. 80-81; Ex C-11 at p. 392).

Trial counsel has broad discretion in determining strategy, and in deciding which witnesses to investigate and call. *Chandler v. United States*, 218 F.3d 1315 n.16, n.17.  "[C]ounsel cannot be adjudged incompetent for performing in a particular way in a case, as long as the approach taken 'might be considered sound trial strategy.'" *Id*. at 1314 (quoting *Darden v. Wainwright*, 477 U.S. 168, 186-87 (1986).  Tactical decisions within the range of reasonable professional competence are not subject to collateral attack, unless a decision was so "patently unreasonable that no competent attorney would have chosen it." *Adams v. Wainwright*, 709 F.2d 1443, 1445 (11th Cir. 1983).   Here, a reasonable attorney may have concluded that Giles and Miller were not helpful to, and in fact might harm, Petitioner's case, and that the evidence of Petitioner's cocaine use would be better presented through Dr. Regnier and other witnesses' testimony.  Therefore, Petitioner has not shown that the Florida Supreme Court's application of *Strickland*'s deficiency prong was objectively unreasonable.

With regard to Evelyn Ford, the Florida Supreme Court concluded that counsel was not deficient in failing to call her because Petitioner never provided counsel with her name. *Whitfield*, 923 So. 2d at 382. Petitioner has presented no evidence to rebut this determination.

Nor has he shown that a reasonable investigation should have uncovered Ford. This is especially true in light of Petitioner's lack of cooperation with counsel and Dr. Regnier (Resp. Ex. C-9 at p. 87, Resp. Ex. C-11 at p. 429). Therefore, Petitioner has not shown that the Florida Supreme Court's application of *Strickland*'s deficiency prong was objectively unreasonable.

Even if counsel was deficient in failing to discover Ford, the Florida Supreme Court ruled that Petitioner failed to demonstrate any prejudice in his counsels' failure to call her as a witness because her testimony was cumulative, and her testimony "would have had the further liability of opening up for exploration Whitfield's violent tendencies." *Whitfield*, 923 So. 2d at 382. During the post conviction evidentiary hearing, Ms. Ford testified that beginning in 1983, she was Petitioner's next door neighbor (Resp. Ex. C-11 at p. 382). Petitioner's mother, Leola Rich, would babysit for her at times, and she was over at Rich's apartment almost every day (Id.). Sometimes she would see Petitioner come home looking as if he had been out all night, and he appeared sad (Id. at pp. 382-83). She would see this happen "every now and then." (Id. at p. 383). One time she saw Petitioner and thought he was high on drugs, and he became angry and broke a window by kicking it (Id.). On another occasion she saw Petitioner angry with his stepfather, and he "busted him in the mouth." (Id.). Those were the only two occasions on which Ms. Ford stated she saw Petitioner when she thought he was high on drugs (Id.). On one occasion she picked Petitioner up in an area where it was known that drugs were sold. (Id.). When she picked him up, she thought he was "a little high." (Id. at p. 384).

21

Petitioner argues that Ford's testimony was important because it would have corroborated Petitioner's "pattern of drug use," and informed the jury how Petitioner's "personality and behavior changes when he is under the influence" of cocaine (Dkt. 1 at p. 9). Petitioner's drug use and behavioral changes, however, were covered by other witnesses during the guilt phase of the trial. LaRue testified on behalf of the State. During cross-examination, she testified that Petitioner came to her house shortly after he had killed the victim (Resp. Ex. A-6 at p. 921). She then testified in relevant part that she thought Petitioner looked like he had been using drugs because his eyes were "big," he was hyperactive and nervous, and he was talking very fast, and, in her prior experiences with Petitioner, that is how he acted and appeared when using drugs (Id. at pp. 937-38).

Estella Brooks Pierre, who lived with Petitioner for a period of time beginning in 1994, testified on behalf of the defense. Pierre testified that she was familiar with how people appeared when using crack cocaine (Resp. Ex. A-7 at pp. 1140-41). She testified that Petitioner exhibited signs of being on crack cocaine, such as being "wide eyed," weak, and unable to remain still (Id. at 1141). She also testified that she first became suspicious that Petitioner was using drugs when after he would get paid he would not come home for a few days, and he started stealing items from Pierre (Id. at pp. 1138-39). She further testified that Petitioner admitted to her that he had a drug problem (Id. at 1143). Finally, she testified that Petitioner's drug use increased after he was shot in April 1995 (Id. at 1144).

Dr. Regnier testified during the guilt phase of the trial that Petitioner had a substance abuse problem (Resp. Ex. A-7 at pp. 1190-91). He corroborated Petitioner's history of drug

abuse by interviewing people who knew Petitioner and examining medical and other records regarding Petitioner (Id. at pp. 1190-95).  He testified that a person high on crack cocaine will walk around a lot, talk fast, and have enlarged eyes (Id. at 1200-01).  This testimony was consistent with LaRue's testimony regarding Petitioner's appearance the morning of the murder.  Dr. Regnier also testified that Petitioner stated that he had a "blackout" and could not remember the sexual battery he committed immediately before the murder, and that was consistent with "cocaine use as well as a desire not to recall."  (Id. at pp. 1235-36).  Dr. Regnier concluded that he believed Petitioner "was under a lot of cocaine" the day of the murder (Id. at p. 1241).

Therefore, Ms. Ford's testimony, at best, was merely cumulative to LaRue, Pierre, and Dr. Regnier's testimony regarding Petitioner's drug use.   Cumulatively, those witnesses testified to Petitioner's long history of drug use, his appearance when high on cocaine, his pattern of drug use, and his drug use on the day of the murder.  At worst, Ms. Ford's testimony would have, as the Florida Supreme Court noted, opened the door for the State to explore Petitioner's violent tendencies. *Whitfield*, 923 So. 2d at 381.  Therefore, the Florida Supreme Court's determination that counsels' failure to call Ms. Ford during the guilt phase of the trial did not prejudice Petitioner was not an unreasonable one.

Finally, Petitioner argues that although LaRue testified on behalf of the State during the guilt phase of the trial regarding Petitioner's appearance and behavior shortly after the murder, counsel was ineffective in failing to call LaRue as a defense witness.   The Florida Supreme Court, however, correctly found that LaRue's testimony during the state post

conviction evidentiary hearing "added nothing new" to her trial testimony.  *Whitfield*, 923 So. 2d at 382; (see Resp. Ex. C-11 at pp. 385-89).  Therefore, the Florida Supreme Court's determination that defense counsels' failure to call LaRue on behalf of the defense during the guilt phase was not deficient performance and did not prejudice Petitioner, was not an unreasonable one.

**B.      Failure to consult with or hire a toxicologist**

In his reply, Petitioner separates this claim into two parts: 1) counsel were ineffective in failing to procure a urine or hair sample from Petitioner immediately after his arrest in order to establish "the presence of crack cocaine in his body and to provide some quantitative measure of that drug;" and 2) counsel were ineffective in failing to "investigate, consult, and present the testimony of a toxicologist to testify as to the effects of crack cocaine on the brain, the behavioral changes associated with crack cocaine, and to offer a conclusive opinion as to whether [Petitioner] was able to form the requisite intent to commit first degree murder as a result of his voluntary ingestion of crack cocaine shortly before the crimes." (Dkt. 78 at pp. 9-10).

**1.      Failure to procure a urine or hair sample**

Prior to the start of trial, Petitioner moved the trial court to appoint new counsel (Resp. Ex. A-5 at pp. 591-600).  One argument he made in support of his request was that he had asked counsel to obtain urine and hair samples from him for testing, but counsel failed to do so (Id. at pp. 598-600).  In response, defense counsel Scott stated that after Petitioner requested counsel obtain a urine sample from Petitioner for analysis, she "spoke to not one

but definitely two and possibly three local authorities" about the possibility of taking urine samples and "was advised that it wouldn't show what [Petitioner] wanted us to show." (Id. at p. 600). Scott stated that she and co-counsel discussed obtaining a urine test "at length," but based on the information she received from the laboratory, she and co-counsel decided "that it was not going to serve any useful purpose" to take a urine sample and have it tested (Id. at p. 601).

During the state post conviction evidentiary hearing, Scott (now Syprett) testified that on the day after she and co-counsel were appointed to represent Petitioner (two days after Petitioner was arrested), they went to the jail to meet with Petitioner (Resp. Ex. C-11 at 422-23).  She knew there was an intoxication issue, specifically, the "intensity or the amount of drugs or alcohol in [Petitioner's] blood at the time of the offense." (Id. at pp. 423-24).  She spoke with a toxicologist at Smith Klein laboratory, and made other calls but "didn't get anybody who would say what I wanted to find out as possible." (Id. at p. 424-25; 445).  She was told "its nonsensical what you all are trying to do." (Id.).

Having reviewed the record, this Court cannot say that the Florida Supreme Court's determination that counsels' decision not to obtain urine or hair samples was not deficient performance, was either an unreasonable application of *Strickland* or based on an unreasonable determination of the facts.  Defense counsel made a reasonable investigation into the efficacy of obtaining testing for the presence and amount of cocaine in Petitioner's system at the time of the murder by immediately contacting two or three toxicologists'

offices. Counsels' decision not to obtain testing in light of the responses they received from the toxicologists' offices was reasonable.

Petitioner argues that counsel were deficient because "they did not follow the preeminent source of professional education and information regarding the defense of capital cases[,]. . .Defending a Capital Case in Florida," which states in pertinent part that "[e]ffective mitigation investigations begins [sic] with early contact with the client. The first contact with the client is important to assess the following. . .[c]ollection of blood, urine, or hair samples that can be used for toxicological testing to help corroborate substance abuse . . . ." (Dkt. 78 at p. 12). The record shows, however, that counsel *did* follow these guidelines by meeting with Petitioner within twenty-four hours after they were assigned to represent him, and immediately investigating and assessing whether collecting samples from Petitioner would be useful for toxicological testing. Based on the information they received in response to their inquiries, counsel determined that testing would not be helpful. Nothing in the guidelines proffered by Petitioner indicates that where counsel has reasonably determined that testing would not be helpful, counsel should still collect blood, urine, and hair samples and have them tested.

Even if the Court were to assume that counsels' failure to obtain toxicological testing of Petitioner's urine or hair constituted deficient performance, Petitioner cannot show prejudice. In determining that Petitioner had failed to establish prejudice from counsels' failure to obtain urine and hair analyses, the Florida Supreme Court stated that "Dr. Mash did not indicate that she would be able to determine Whitfield's exact level of crack cocaine

exposure at the time of the murder" and that "Dr. Mash's testimony does not indicate that, had a urine sample been taken, an accurate reading of the level of cocaine in Whitfield's body at the time of the murder would have been established." *Whitfield*, 923 So. 2d at 383-84.

During the state post conviction evidentiary hearing, Dr. Mash, an expert in the field of toxicology and the effects of crack cocaine drug abuse on the brain, testified on Petitioner's behalf (Resp. Ex C-11 at pp. 187-237). She testified in pertinent part that by the time defense counsel were appointed and met with Petitioner two days after the murder and his arrest, a blood test would not have been useful to Petitioner because evidence of cocaine "would be cleared." (Id. at p. 227). She testified, however, that "urine would have been a good indicator of recent use of cocaine, definitely. And hair samples would have definitely corroborated unequivocally that this was a serious crack user." (Id. at p. 226). Although Dr. Mash testified that you can quantify the amount of cocaine in urine (Id. at p. 235), she also testified that on June 21, 1995, "the level of cocaine would be starting to come down in the urine as well." (Id. at 236). And, she testified that on June 21st, a urine test "would have given us a pretty good indication, not an absolute because blood is absolute, of amounts and patterns of use based on ratios of cocaine to benzoylecgonine." (Id. at 237). As to testing on hair, Dr. Mash stated "hair would have given us. . .a 30-day window of issues. . .we quantify hair even too, so you can actually see patterns of use, if there's low use, high use, you can begin to see again a profiling, if you will." (Id.).

Therefore, although Dr. Mash indicated that urine and hair tests on June 21st "would have given. . .a pretty good indication. . .of amounts and patterns of use [of cocaine]. . .[,]" the Florida Supreme Court correctly found that "Dr. Mash's testimony [did] not indicate that, had a urine sample been taken, an accurate reading of the level of cocaine in Whitfield's body at the time of the murder would have been established."  Petitioner's level of intoxication at the time of the murder was critical to his voluntary intoxication defense.  *See Turner v. State*, 91 So. 3d 916, 918 (Fla. 2d DCA 2012) ("a proven claim of. . .intoxication. . .would have negated the specific intent necessary for a conviction").  Further, Petitioner's assertion that urine and hair testing "would have led to objective data being presented to the jury to confirm the conclusions of the mental health professional[s]" (Dkt. 78 at p. 15) is wholly speculative.  Petitioner has not presented any evidence of the level of cocaine in his body at the time of the murder.  The results of urine and hair tests could have just as easily been harmful as helpful - - if the results of the tests indicated either a low or no level of cocaine.

In sum, even if Petitioner had established his counsels' performance was deficient in failing to obtain testing of Petitioner's urine and hair, Petitioner would still not be entitled to relief because he also failed to demonstrate "that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694.  "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id*.  The Florida Supreme Court determined that Petitioner had failed to establish that he was prejudiced by counsels' failure to obtain testing

28

of Petitioner's hair and urine. In light of the record, this Court cannot say that this determination was an unreasonable application of *Strickland*.

        **2.**        **Failure to investigate, consult, and present the testimony of a toxicologist**

        Petitioner contends counsel were ineffective in failing to hire a toxicologist who could have testified to the effect of crack cocaine on the brain, Petitioner's cocaine paranoia at the time of the murder, and Petitioner's brain and neurological damage. The Florida Supreme Court concluded there was no deficient performance because "[t]rial counsel made a reasonable choice based on available information not to obtain a toxicology expert." *Whitfield*, 923 So. 2d 384.

        During the state post conviction evidentiary hearing, Attorney Williams testified that "we never called a toxicologist" and "I did not consult a toxicologist." (Resp. Ex. C-9 at pp. 112-13). Attorney Williams also testified, however, that he did not have an independent recollection of talking to a toxicologist but "Miss Scott may have had a conversation with him." (Id. at p. 37).

        Attorney Scott (Syprett) testified on direct examination that she recalled that she "spoke to the toxicologist at Smith Klein" and that counsel "attempted" and "pursued" having a toxicologist involved in the case but "it didn't work out." (Resp. Ex. C-11 at p. 425). She was told that the information they were seeking "was not obtainable." (Id.). On cross examination, she testified that she recalled speaking with several laboratories (Id. at p. 441). She recalled have a "working relationship with somebody at Smith Klein." (Id.). After calling Smith Klein, she remembered "thinking. . .well, let me see if I can corroborate

that and get another expert. And then I think I made several other phone calls and essentially asked the question, you know, would you be able to tell me this, that, and whatnot, and the response is no." (Id. at pp. 441-42). She testified that she remembered calling another toxicologist's office because he had an unusual name, Pootcas, and that she spoke with someone in that office (Id. at pp. 442-43). When asked if she actually spoke to a toxicologist at Smith Klein, Attorney Scott stated that she did not have an independent recollection of whom she spoke to at Smith Klein, but based on her time records and a pre-trial transcript, she believed that she did speak with a toxicologist (Id. at p. 444). She testified that prior to Petitioner's trial, she had retained toxicologists in other cases (Id. at 466-67).

The record therefore shows that after investigating whether drug testing would be helpful in determining levels of Petitioner's drug use, and after talking to multiple toxicologist offices, counsel decided not to pursue testing or hiring a toxicologist. Consequently, on this record, this Court cannot say that the Florida Supreme Court's determination that counsel were not deficient in failing to hire a toxicologist because they "made a reasonable choice based on available information not to obtain a toxicology expert," was objectively unreasonable.

Likewise, this Court cannot say that the Florida courts were unreasonable in viewing defense counsels' decision not to retain and present a toxicologist as not prejudicial to the outcome of Petitioner's trial. As previously noted, Petitioner contends the counsel should have hired a toxicologist "to testify as to the effects of crack cocaine on the brain, the behavioral changes associated with crack cocaine, and to offer a conclusive opinion as to

30

whether [he] was able to form the requisite intent to commit first degree murder as a result of his voluntary ingestion of crack cocaine shortly before the crimes." (Dkt. 78 at pp. 9-10).

During the state post conviction evidentiary hearing, Dr. Mash testified, in pertinent part, regarding the effects of crack cocaine on the brain (Resp. Ex. C-11 at pp. 189-209). She also testified that Petitioner was a severe crack cocaine addict who sustained brain and neurological damage from the crack cocaine abuse (Id. at p. 215-17). Her opinion was that Petitioner "was in a state of cocaine paranoia" at the time of the murder (Id. at p. 223).

During trial, Dr. Regnier testified in pertinent part that Petitioner had a substance abuse problem, specifically, crack cocaine (Resp. Ex. A-7 at pp. 1190, 1195). He further testified to the effects of chronic use of crack cocaine on the brain, and the behavioral changes associated with crack cocaine use (Id. at pp. 1199-1202). In Dr. Regnier's opinion, Petitioner was under the influence of a lot of crack cocaine at the time of the murder (Resp. Ex. A-8 at pp. 1218, 1241). Dr. Regnier had "a reasonable amount of doubt" that Petitioner could have formed the intent to murder the victim, but he was not certain of that opinion because Petitioner's lack of cooperation prevented him from obtaining all the data he needed to make that determination (Id. at pp. 1221-22, 1230). He also testified that he was unable to form a definitive opinion whether or not Petitioner was in a state of "cocaine psychosis" at the time of the murder because Petitioner "had not done much of [Dr. Regnier's] testing at all." (Id. at 1240). Nevertheless, Dr. Regnier testified that the reason Petitioner stabbed the victim multiple times may have been because he was in a "frenzied state" (Id. at 1231). Further, he testified that Petitioner's reported "blackout" or inability to remember the sexual

battery he committed shortly before the murder was consistent with "cocaine use as well as a desire not to recall."  (Id. at pp. 1235-36).

Petitioner has failed to show prejudice as a result of counsels' decision not to hire a toxicologist.  Dr. Regnier testified as to the effects of crack cocaine on the brain, the behavioral changes associated with crack cocaine, and that Petitioner had used a lot of cocaine just prior to the murder.  Further, Dr. Mash did not testify that Petitioner could not form the requisite intent necessary to commit first-degree murder and armed burglary (Resp. Ex. C-11 at pp. 187-237).  Moreover, although Dr. Mash rendered an opinion that Petitioner was experiencing cocaine paranoia at the time of the murder, she did so with Petitioner's cooperation (Id. at pp. 216, 232-33).  Dr. Regnier's inability to render the same opinion was directly attributable to Petitioner's failure to cooperate with Dr. Regnier.

In sum, Petitioner has failed to show prejudice because he has failed to demonstrate a reasonable probability of a different outcome had counsel presented additional lay witness and a toxicologist's testimony during the guilt phase of the trial to support the voluntary intoxication defense.

The Florida Supreme Court's denial of this claim was neither an unreasonable application of clearly established federal law, as determined by the Supreme Court, nor based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding.  Accordingly, Ground I does not warrant habeas corpus relief.

**Ground II**

"THE FLORIDA STATE COURT'S DENIALS OF MR. WHITFIELD'S [sic] CLAIM THAT HE WAS DENIED THE EFFECTIVE ASSISTANCE OF COUNSEL PRETRIAL AND AT THE GUILT/INNOCENCE PHASE OF HIS TRIAL IN VIOLATION OF THE SIXTH, EIGHTH, AND FOURTEENTH AMENDMENTS WHEN COUNSEL FAILED TO ADEQUATELY INVESTIGATE, PREPARE AND PRESENT THE DEFENSE CASE IN AN EFFORT TO PRESENT MR. WHITFIELD'S CASE UNDER THE TIME LIMITATIONS PURSUANT TO FLA. R. CRIM. P. 3.191, ET. SEQ, WERE CONTRARY TO, OR INVOLVED AN UNREASONABLE APPLICATION OF CLEARLY ESTABLISHED FEDERAL LAW AND/OR WERE BASED UPON AN UNREASONABLE DETERMINATION OF THE FACTS"  (Dkt. 1 at pgs. 18-22).

In Ground II, Petitioner complains that defense counsel were ineffective in failing to waive Petitioner's speedy trial rights.  Petitioner asserts that because counsel failed to waive his speedy trial rights, counsel did not have sufficient time to adequately investigate his case and prepare for trial.  Petitioner argues that he was prejudiced by counsels' lack of preparation and inadequate investigation because Dr. Regnier's, Petitioner's most critical witness, was unprepared for trial as a result of the speedy trial demand.

In denying this claim, the state post conviction court found that counsel did not render deficient performance.  The state post conviction court stated:

> Claim six alleges ineffective assistance of counsel in the guilt and penalty phase for failure to adequately investigate, prepare, and present the defense case due to the time limits imposed by the speedy trial rule. Before a defendant is entitled to relief on an ineffective assistance of counsel claim for failure to properly prepare for trial, a defendant must demonstrate how the alleged deficiencies in his counsel's performance prejudiced the case. *See Vento v. State*, 621 So.2d 493 (Fla. 4th DCA 1993). Central to the defense's claim is an allegation that Williams and Syprett made the unwise choice to demand speedy trial, and that this "strategy" was solely within their discretion. A full and thorough review of the record, as detailed below, however, refutes this allegation. [FN 52].

As early as July 12, 1995, the court was informed of Whitfield's desire that his attorneys demand a speedy trial. [FN 53]. At the next court proceeding on August 4, 1995, Judge Rapkin read a letter written by Whitfield, which contained the following excerpt: **"This letter is my official notification that I intend to exercise my right to a fast and speedy trial. If you office does not file this motion by 7/28/95, please excuse yourself from representing my case."** R. 10-11. (Emphasis added).

At this proceeding, Williams informed the Court about the conflict involving the speedy trial issue. In summary, the defense attorneys were clearly against demanding a speedy trial. Whitfield, however, unequivocally demanded that he be allowed to exercise his right to a speedy trial [FN 54] when, in open court, he stated: "I want a formal speedy trial. That's my right." [FN 55]. Whitfield reiterated his position in court again on August 11, 1995, when he told Judge Rapkin: "I want a speedy trial." (R31).

Later in the proceedings, when Williams requested a continuance [FN 56] to better prepare for trial, Judge Rapkin denied his request [FN 57] and ruled "your client has demanded a speedy trial, which is his right: and "you don't have the right to [waive speedy trial] without his consent." (R51). Again, in open court proceedings on September 7, 1995, Whitfield demanded his speedy trial rights again, despite Williams' warnings and objections. (R54-57). At this time, Judge Rapkin concluded that "There is only one decision, there's only one ship, there's only one captain, and it's his case, and it's his life. He's the one that chooses the speedy trial." (R57). It is unclear to this court, what additional steps defense counsel could have employed, other than what was already attempted and denied by the court, to delay proceeding to trial.

The court is ever mindful that when a defendant demands speedy trial, a trial court should not "second-guess" the trial strategy and strike the demand "simply because the defendant who filed the demand has been charged with first-degree murder and will have to forego discovery in exchange for a speedy trial" or a first-degree murder defendant "effectively would never be able to demand a speedy trial." *Landry v. State*, 666 So.2d 121, 127 (Fla. 1995). In *Landry*, the Florida Supreme Court further suggested that when a tactical decision is made by counsel to not engage in discovery, it would be prudent for the trial court to inquire of the defendant to determine whether the defendant concurs with the strategy. *Landry*, 666 So.2d at 128, n. 10. Clearly, Whitfield did not concur with his attorneys desire for a trial continuance. Judge Rapkin clearly informed Whitfield of the strong probability that he would postpone the trial, if Whitfield advised the Court that he wanted his

34

attorneys to take additional depositions. Whitfield responded: "I don't want the trial put off." (R55-56).

Concerning the penalty phase of trial, testimony at the evidentiary hearing revealed the extent to which Whitfield failed to cooperate with his defense attorneys in attempting to prepare for the penalty phase. (PC-R 69-70; 87; 427; 454-55). Following the guilty verdict, defense counsel requested and was able to obtain additional time to prepare for the penalty phase. (R1444-46). Then, at the conclusion of the penalty phase, defense counsel was provided additional time within which to file a sentencing memorandum setting forth factors for mitigation. Defense counsel filed a detailed sentencing memorandum on October 6, 1995. The sentencing memorandum contains argument in support of three statutory mitigators and six nonstatutory mitigators.

In ruling on this claim, the Court is ever mindful of Dr. Regnier's testimony concerning why he was unable to render a final opinion on the crucial voluntary intoxication defense in Whitfield's case. In particular, Regnier clearly testified that his testing was incomplete because Whitfield would not cooperate with him, not because of time constraints, and had Whitfield cooperated, the speedy trial constraints would not have been an issue. (PC-R 156-58). The Court further notes that up until Whitfield's recent evaluations by Mash and Fisher, Whitfield had been uncooperative with his attorneys and mental health professionals.

Regnier also testified that Whitfield informed him of his strategy to make his attorneys look bad, in case an appeal was necessary. (PC-R 170-73). This strategy was evident when, on the morning of the first day of trial, Whitfield attempted to discharge his attorneys, and then refused to communicate reasons for the desired discharge to the court. (R470-98). Review of this case reveals that Whitfield consistently and repeatedly refused to cooperate with his defense attorneys and Regnier. This lack of cooperation may have hindered the defense but any deficiency present was due to Whitfield's actions, not his attorneys' performance.

Based upon these findings, this Court concludes that defense counsel made bona fide attempts to obtain additional time to prepare for trial, but the trial judge denied the requests for additional time, because of Whitfield's unequivocal and repeated demand for speedy trial. When faced with proceeding to trial in very difficult and challenging circumstances, defense counsel acted appropriately and did not render ineffective assistance of

counsel. *See Turner v. Crosby*, 339 F.3d 1247, 1276, n.22 (11th Cir. 2003). Claim Six is denied.

[FN 52] On direct appeal, the Florida Supreme Court found the "the record indicates that Whitfield demanded, against the advice of his attorneys, speedy trial. Whitfield's attorneys had expressed to him the need for additional time to prepare for trial and to engage in plea negotiations with the State. Whitfield ignored their advice stating that he was dissatisfied with the possible option of two consecutive life sentences." *Whitfield v. State*, 706 So. 2d 1, 3, n.1 (Fla. 1997).

[FN 53] See R. 2-6.

[FN 54] No less than four times, Whitfield asserted that he was "exercising his right" to demand a speedy trial. Further, Whitfield explained to the Court that a speedy trial was in his best interest and would result in protecting a lot of people. (R14-17).

[FN 55] See (R17).

[FN 56] Williams filed a Motion for Continuance on September 5, 1995, detailing Whitfield's continued demand for speedy trial and the potential problems in proceeding to trial later in the month. (See attached).

[FN 57] CCRC-M argues that defense counsel could have waived speedy trial without Whitfield's consent and against his wishes. There appears to be some support for this position in older case law. *See State v. Abrams*, 350 So. 2d 1104 (Fla. 4th DCA 1977); *Earnest v. State*, 265 So. 2d 397 (Fla. 1st DCA 1972). In the present case, however, the trial judge denied Williams' request for a continuance after Williams filed a proper motion to continue and a hearing was held. Whitfield has failed to demonstrate what additional actions his attorney could have taken to achieve a continuance since the trial court ruled that Whitfield had a right to a speedy trial. *See Turner v. Crosby*, 339 F.3d 1247, 1276, n. 22 (11th Cir. 2003).

(Resp. Ex. C-5 at record pp. 874-77).

36

This Court agrees with the state post conviction court that defense counsels' performance was not deficient. Petitioner adamantly demanded a speedy trial. Defense counsel informed both Petitioner and the trial court that it was not in Petitioner's best interest to proceed to trial within the speedy trial period (Resp. Ex. A-1 at pp. 11-13). Petitioner, however, was undeterred and demanded counsel either file a motion for a speedy trial or a motion to withdraw as counsel (Id. at pp. 10-11). Although recognizing that the decision whether to file a demand for a speedy trial was ultimately counsels', counsel agreed to file the demand for a speedy trial[4] because Petitioner insisted on it, and because counsel "felt it was very important that Mr. Whitfield and [counsel] have a very good working relationship on a case such as this. . . ." (Id. at p. 29). Counsel, however, informed both Petitioner and the trial court that despite having agreed to file the demand for a speedy trial, they were likely to file a motion to withdraw the speedy trial motion if they were unable "to accomplish what [they] need[ed] to accomplish within the speedy trial time period." (Id. at pp. 29-31).

On September 5, 1995, counsel filed a Motion for Continuance of the September 18, 1995 trial, in which counsel asserted that "counsel for Defendant cannot be prepared [for trial] by that date" and "counsel for Defendant hereby waives speedy trial." (Resp. Ex. A-12 at record pp. 1900-01). The trial court, however, denied the motion and stated in pertinent part that counsel does not "have the right to [waive speedy trial] without [Petitioner's]

---

[4]See Resp. Ex. A-12 at record p. 1861.

consent." (Resp. Ex. A-1 at p. 51).[5]  Further, defense counsel and the trial court informed Petitioner that defense counsel needed more time to prepare for trial (Id. at pp. 51-56). Nevertheless, the trial court denied the motion for a continuance after Petitioner unequivocally stated that "I don't want the trial put off."  (Id. at p. 56).

First, it is apparent from counsel's statements to the trial court that counsel decided to file the demand for a speedy trial because he believed it was necessary to preserve a viable working relationship with Petitioner, which counsel believed was very important to Petitioner's case (Id. at p. 29).  Petitioner was adamant that he receive a speedy trial, and demanded counsel withdraw from representing him if they did not demand a speedy trial. In light of "the circumstances of counsel's challenged conduct, and . . . from counsel's perspective at the time," *Strickland*, 466 U.S. at 689, this Court finds that defense counsels' decision to  preserve the attorney-client relationship by demanding a speedy trial, while at the same time intending to subsequently seek a continuance if further trial preparation were necessary, was not constitutionally deficient.  Petitioner has failed to show that not one reasonably competent attorney would act as did his own counsel in this circumstance.  *See Chandler v. United States*, 218 F.3d 1305, 1313 (11th Cir. 2000) (For a petitioner to show deficient performance, he "must establish that no competent counsel would have taken the action that his counsel did take.").  *See also Johnston v. Singletary*, 162 F.3d 630, 642 (11th

---

[5]It appears that the trial court's position was incorrect under Florida law.  *State v. Abrams*, 350 So. 2d 1104, 1105 (Fla. 4th DCA 1977) ("[T]he right to a speedy trial is waived when the defendant or his attorney request a continuance. The acts of an attorney on behalf of a client will be binding on the client even though done without consulting him and even against the client's wishes.") (citations omitted).

Cir. 1998) ("[T]he reasonableness of counsel's actions may be determined or substantially influenced by the defendant's own statements or actions. . .Similarly, when the strategy an attorney might otherwise pursue is virtually foreclosed by his client's unwillingness to facilitate that strategic option, it is difficult for our court, in a collateral proceeding, to characterize as unreasonable counsel's decision to abandon that otherwise preferable strategy.") (internal marks and citation omitted).

Second, defense counsel subsequently attempted to waive speedy trial and move for a continuance.[6]  The trial court ruled, however, that speedy trial was Petitioner's right, counsel could not waive speedy trial without Petitioner's consent, and that a continuance would not be granted in light of Petitioner's unequivocal demand for a speedy trial.  In light of the trial court's ruling, counsel cannot be deemed deficient in failing to secure more time to prepare for trial.  *See Turner v. Crosby*, 339 F.3d 1247, 1276 n.22 (11th Cir. 2003) (concluding that counsel was not ineffective in failing to secure more time to locate additional mitigating evidence where trial court denied counsel's motion for a continuance prior to sentencing hearing).[7]

Even if counsel performed deficiently, the Florida Supreme Court properly concluded that Petitioner did not suffer prejudice in connection with his counsels' failure to waive

---

[6]Arguably, defense counsels' Motion for Continuance waived Petitioner's speedy trial right.  *See MacPhee v. State*, 471 So. 2d 670, 671 (Fla. 2d DCA 1985) ("A defense-requested continuance waives speedy trial.") (citations omitted).

[7]In his reply, Petitioner argues that "[t]here is no duty that requires counsel to blindly follow the wishes of a defendant." (Dkt. 78 at p. 23).  In this instance, however, defense counsel did not "blindly follow" Petitioner's wishes.  Rather, counsel advised Petitioner not to demand a speedy trial, and subsequently attempted, albeit unsuccessfully, to waive speedy trial and continue the trial.

Petitioner's speedy trial rights.  In affirming the state post conviction court's denial of this

ineffective assistance of counsel claim, the Florida Supreme Court concluded:

> Against the advice of his trial lawyers, Whitfield emphatically, unequivocally, and repeatedly demanded a speedy trial. [FN7]  Now he claims that trial counsel were ineffective as a result. He argues that making a demand for speedy trial under Florida Rule of Criminal Procedure 3.191 is a strategic decision within the province of counsel's discretion. Because we determine that no prejudice resulted from the speedy trial demand, we need not consider whether counsel provided deficient performance by acquiescing in Whitfield's desire to request speedy trial. *See Orme v. State*, 896 So. 2d 725, 736 n. 2 (Fla. 2005) (declining to reach prejudice prong where no deficient performance found); *Sweet v. State*, 810 So. 2d 854, 863-64 (Fla. 2002) (declining to reach the question of deficient performance where the Court determined that no prejudice existed); *Stewart v. State*, 801 So. 2d 59, 65 (Fla. 2001) ("[B]ecause the *Strickland* standard requires establishment of both [deficient performance and prejudice] prongs, when a defendant fails to make a showing as to one prong, it is not necessary to delve into whether he has made a showing as to the other prong.").
>
> The time constraints placed on the defense team because of the speedy trial time line did not prejudice Whitfield's defense. It is true that Dr. Regnier testified at trial that he was unable to form an ultimate opinion as to voluntary intoxication because he had insufficient data. However, at the evidentiary hearing below he testified that the reason for his inability was not the speedy trial demand but Whitfield's deliberate refusal to cooperate. [FN8]  Despite these difficulties and the time constraints of speedy trial, the defense team, as noted earlier, obtained a voluntary intoxication jury instruction. Furthermore, the trial court noted in its final sentencing order that it believed Whitfield was a severe crack cocaine addict and was under the influence on the morning of the murder.
>
> Despite his behavior at trial, Whitfield has cooperated with his current defense team. However, other than one additional witness, Freddy Lewis Stanley Atkins (discussed below), who could have offered only cumulative evidence of Whitfield's background, the current defense team has based their case on essentially the same information presented at trial. Whitfield has presented two new experts who testified that, in their opinion, Whitfield was incompetent to make strategic decisions and that Dr. Regnier's examination of Whitfield was insufficient. But an ineffective assistance of counsel claim

cannot be based on a defendant's procurement of new experts with different opinions. *See Phillips v. State*, 894 So. 2d 28, 39 (Fla. 2004) ("The fact that [defendant] now has new experts does not indicate that his counsel was ineffective, where counsel did investigate and present evidence on the[] issues."). Whitfield does not present any significant new evidence that would have been discovered and presented had speedy trial not been demanded. Whitfield cannot establish prejudice on these facts.

> [FN7] Whitfield made these demands on several occasions in open court. In one pretrial hearing Whitfield personally demanded speedy trial at least five times, stating: "It's also in my best interest I would like to exercise my rights, and my rights are asking you to grant me a speedy trial."; "So I'm asking you to grant me that motion for a speedy trial. I'm exercising my rights . . . I am open and willing to sign anything for me to have a speedy trial . . . I want a speedy trial."; "But I--I want to exercise my right, and that is my right, constitutional right to--for a speedy trial."; "I want a formal speedy trial. That's my right. That is my constitutional right . . . I do not want to delay this . . . because a lot of people will get hurt, a lot of things will come out, all right, and I would like to protect a lot of people."; "That's what I had notarized to get this speedy trial in process, right."

> [FN8] Dr. Regnier testified that regarding his psychological tests on Whitfield, "had he cooperated, time would not have been an issue." Further evidentiary hearing testimony established that Whitfield admitted to Dr. Regnier that he hoped that neither his attorneys nor the prosecution would be ready for trial because of his speedy trial demand. He also told Dr. Regnier that he hoped this situation would bring about a mistrial or provide him with many grounds for appeal.

*Whitfield*, 923 So. 2d at 384-85.

In his petition, Petitioner asserts that "the prejudice that followed" counsels' failure to waive speedy trial "was the inability of Dr. Regnier to offer an opinion with regards to the defense theory of voluntary intoxication." (Dkt. 1 at p. 20). During the state post conviction

evidentiary hearing, however, Dr. Regnier testified that he was unable to form a definitive opinion as to whether Petitioner could have possessed the premeditated design to effect the murder because he was unable to test and obtain data from Petitioner due to Petitioner's failure to cooperate with him (Resp. Ex. C-9 at pp. 156-57).   Further, Dr. Regnier unequivocally testified that "had [Petitioner] cooperated, time would not have been an issue." (Id. at pp. 157-58).   Finally, Dr. Regnier testified in pertinent part that it was Petitioner's "strategy to be completely uncooperative, to make his attorneys look bad, to not cooperate, because these would be actions for mitigation. . . ." (Id. at p. 171).   Therefore, it was Petitioner's deliberate refusal to cooperate, not the time constraints placed on the defense team because of the speedy trial demand, that prejudiced Petitioner.

In his reply, Petitioner asserts that both Dr. Mash and Dr. Fisher testified during the state post conviction evidentiary hearing that during the first 90 days after Petitioner was arrested, he was unable to make effective decisions regarding trial strategy (such as demanding speedy trial and intentionally failing to cooperate with defense counsel and Dr. Regnier) because he was in "a state of neurotoxicity due to crack cocaine addiction."  (Dkt. 78 at 20-21).   Dr. Mash and Dr. Fisher both testified that Petitioner would not have been able to effectively help his defense counsel and make strategic decisions regarding his case during the 90-day period after he stopped using cocaine (Resp. Ex. C-10 at pp. 219, 282). Dr. Fisher, however, also testified that Petitioner had the ability to cooperate if he had chosen to do so (Id. at pp. 305-308).

42

Further, Dr. Regnier testified that Petitioner's failure to cooperate was the result of "a combination of paranoia, bad information from the wrong source in the jail, and probably withdrawal from drugs that he was on. . . ." (Resp. Ex. C-9 at p. 126). The paranoia was "a personality trait, not as a result of drug intoxication[,]" that Petitioner was likely to have for the remainder of his life unless he received "aggressive therapy." (Id.). Moreover, Dr. Regnier acknowledged that his psychological evaluation report of Petitioner indicated that Petitioner "has adequate knowledge, that he has an adequate understanding of the legal process, that he has the ability to disclose to counsel the facts relevant,. . .he is in complete control of his emotions *and thinking*. . . and his refusal to cooperate in court is under his cognitive control." (Id. at pp. 166-68; Resp. Ex. A-13 at record pp. 2098-2105) (emphasis added). Although Dr. Regnier testified that more time with Petitioner would have "yielded more cooperation" (Id. at pp. 154, 157), that was speculative. This is especially true in light of Dr. Regnier's testimony that even years after Petitioner's trial, Petitioner still had "the same behavior that he demonstrated at the time and continued over the years, still not cooperative with counsel, still getting advice from his own sources rather than his legal counsel" (Id. at p. 171), and contemplated refusing to cooperate with the experts hired by defense counsel during the post conviction proceedings (Id. at p. 179).

Finally, to show prejudice, Petitioner "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the [guilt or penalty] proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694. In light of the fact that defense

43

counsel obtained a jury instruction on voluntary intoxication, and the trial court found in its

sentencing order that Petitioner was a crack cocaine addict who probably had used crack

cocaine the morning of the murder,[8] and considering the State's expert witness's opinion that

Petitioner was able to form the specific intent to commit murder (Resp. Ex. A-8 at p. 1262),

and the strong aggravating factors found by the trial court in its sentencing order (Resp. Ex.

A-13 at pp. 2109-2111), the Florida Supreme Court's determination that Petitioner did not

establish prejudice was not an unreasonable one.   Petitioner has not demonstrated a

reasonable probability that his conviction or sentence would have been different had counsel

waived speedy trial.

The state courts' denial of this claim was neither an unreasonable application of

clearly established federal law, as determined by the Supreme Court, nor based on an

unreasonable determination of the facts within the meaning of 28 U.S.C. § 2254(d).

Accordingly, Ground II will be denied.

**Ground III**

"THE FLORIDA COURT'S DENIAL OF MR. WHITFIELD'S CLAIM THAT HE WAS
DENIED THE EFFECTIVE ASSISTANCE OF COUNSEL AT THE SENTENCING
PHASE OF HIS TRIAL, IN VIOLATION OF THE SIXTH, EIGHTH, AND
FOURTEENTH AMENDMENTS RESULTED IN A DECISION THAT WAS
CONTRARY TO, OR INVOLVED AN UNREASONABLE APPLICATION OF
CLEARLY ESTABLISHED FEDERAL LAW AND/OR RESULTED IN A DECISION
THAT WAS BASED ON AN UNREASONABLE DETERMINATION OF THE FACTS
IN LIGHT OF THE EVIDENCE PRESENTED."  (Dkt. 1 at pgs. 23-43).

---

[8]The trial court gave substantial weight to the non-statutory mitigating factor that Petitioner suffered
chronic crack cocaine addiction (Resp. Ex. A-13 at record p. 2113).

Petitioner contends that trial counsel were ineffective in failing to adequately investigate and prepare for the penalty phase of the trial. He argues that counsel "failed to locate witnesses, challenge state witnesses, and fully develop known testimony and psychological reports." (Dkt. 1 at pp. 23-24). Specifically, Petitioner maintains that counsel were ineffective in failing to either locate or call Fred Atkins (a former social worker who worked with Petitioner's family), Leola Rich (Petitioner's mother), Dinah Michelle Giles (Petitioner's sister), Evelyn Ford (Petitioner's former neighbor), Harriet Miller (Petitioner's ex-wife), William Peterson (Petitioner's former employer), and Peggy LaRue (sister of Petitioner's former girlfriend) as witnesses in the penalty phase. Petitioner further asserts that counsel inadequately investigated Petitioner's mental health background. Petitioner contends that had counsel adequately investigated his mental health history, they would have discovered that Petitioner suffered brain damage, and that Petitioner was under the influence of extreme mental or emotional disturbance at the time of the murder, a statutory mitigator.

Petitioner raised the claim regarding the failure to call additional lay witnesses in Claim VII of his amended motion to vacate (Resp. Ex. C-2 at record pp. 285-91). In denying the claim the state post conviction court stated:

> The remaining sub issue concerns an allegation of ineffective assistance of counsel for failure to investigate and prepare for the penalty phase by not locating the following witnesses and fully developing known testimony:
>
> **Fredd [sic] Atkins**: Defense alleges that Atkins would have been available to testify about many details regarding Whitfield such as Atkins' social work with the Whitfield family, Whitfield's troubled childhood, Whitfield's mother's drinking problem, and how Whitfield lived at his house for a while. On cross-examination, however, Atkins admitted that he never

contacted Whitfield, his family or attorneys in 1995, following Whitfield's arrest. (PC-R 345-46). Williams testified that he would have known Atkins' name had Whitfield mentioned it to him, and that he was not aware of any connection between Atkins and Whitfield. (PC-R 88; 107-08; 111). Likewise, Syprett was shocked to learn of the connection between Whitfield and Atkins, and believes she would have taken note of his name had Whitfield told her while she was representing him and preparing for trial. (PC-R 427-28; 468-69).

Based on the testimony of Williams and Syprett, the court determines that trial counsel did not know of Atkins and could not have learned of him based upon Whitfield's lack of cooperation and insistence on a speedy trial, coupled with the family's inability to provide relevant information. *See Marshall v. State*, 854 So.2d 1235, 1247 (Fla. 2003).

**Leola Rich**: While Rich could have provided testimony concerning Whitfield's childhood and his troubled past, the Court finds that Rich appeared at the original trial in what appeared to be an intoxicated condition, and would not have been a credible or reliable witness. Syprett further explained how the defense made a judgment call in not having the family members testify because they were not good historians, were inarticulate, and the defense had concerns about how they would testify when cross-examined. (PC-R 426). Further, Dr. Regnier testified that Whitfield's family had been difficult to locate and how "no one [from his family] called unless they were actively pursued." (PC-R 133; 146-47). The lack of communication and cooperation by the family and Whitfield also contributes to the Court's ruling that defense counsel did not provide ineffective assistance of counsel in failing to call Rich to testify at trial. Based upon this testimony, the Court finds that defense counsel made a strategic decision not to call Rich to testify.

**Dinah Michelle Giles**: According to Williams' testimony, Steele and Regnier met with Whitfield's sister, Dinah Giles, prior to trial to learn background information about the Whitfield family. (PC-R 79-80). Williams decided against having Giles testify because he believed Regnier had knowledge about Whitfield's background and personality and that he would have a better rapport with the jurors. (PC-R 79-82). Williams further opined that Regnier testified about the pertinent family history. (PC-R 81-82). Syprett further explained how the defense made a judgment call in not having the family members testify because they were not good historians, were inarticulate, and the defense had concerns about how they would testify when cross-examined. (PC-R 426). Based upon this testimony, the Court finds that defense counsel made a strategic decision not to call Giles to testify.

**Evelyn Ford**: Williams testified that he cannot recall Whitfield ever mentioning the name "Evelyn Ford" during the investigation. (PC-R 89). The Court finds that Whitfield did not provide this name to his defense attorneys, and further he has failed to demonstrate any prejudice in his attorneys' failure to call her as a witness. *See Marshall v. State*, 854 So.2d 1235, 1247 (Fla. 2003).

**Harriet Miller**: Williams testified that he made a strategic decision to not call Miller to testify at Whitfield's trial because Miller had been a victim of an earlier crime perpetrated by Whitfield, and Williams believed her testimony could have had a negative impact on the trial. (PC-R 80-81).

**William J. Peterson**: Williams testified that he believes the defense spoke with Peterson, but he made a decision not to call him to testify at trial. (PC-R 70; 87-88).

Upon review of this sub-issue, the Court determines that Whitfield failed to demonstrate that his trial attorneys provided ineffective assistance of counsel in their preparation and investigation for the penalty phase; therefore, this portion of Claim Seven is denied. *See Marshall v. State*, 854 So.2d 1235 (Fla. 2003).

(Resp. Ex. C-5 at record pp. 878-80).

In affirming the denial of this claim, the Florida Supreme Court stated:

In his third issue, Whitfield argues that trial counsel were ineffective for failing to call additional witnesses to corroborate evidence of Whitfield's background. Whitfield claims that counsel should have discovered Freddy Lewis Stanley Atkins and called him to testify about Whitfield's family history. Atkins is an important community leader and politician in Sarasota. Early in his career he worked for a family counseling program called Storefront. While there, Atkins was assigned to counsel Whitfield's family. Whitfield claims that trial counsel should have discovered Atkins and called him to corroborate evidence about Whitfield's family history.

However, Whitfield never mentioned Atkins's name to his trial lawyers. Neither did his family. Judge Williams testified at the evidentiary hearing that he recognized Atkins's name but that it was never mentioned by Whitfield, his family, or the investigator on the case. He further testified that it was very difficult to obtain information from Whitfield and that he "received very little

47

support in terms of [Whitfield's family] getting information." Syprett testified that Whitfield never mentioned Atkins's name and that she was "surprised when [she] saw [Atkins] sitting in the hall" at the evidentiary hearing.

Even assuming trial counsel should have found and presented Atkins, Whitfield cannot demonstrate prejudice. Despite Whitfield's lack of cooperation, the defense managed to elicit through their expert significant facts about Whitfield's background. Dr. Regnier testified that Whitfield "suffered from a polydrug dependence that was chronic of long term, spanning some nine years," and that Whitfield also suffered from posttraumatic stress because of his gunshot wound. [FN 9]. Dr. Regnier also testified that Whitfield additionally was "suffering from a major depression also of long standing." This depression was "manifested by a series of suicidal ideation and one serious attempt." Regnier also noted Whitfield's Baker Act commitment. Because of these facts, his review of the record, and his interviews with Whitfield's family, Dr. Regnier opined that at the time of the murder Whitfield was suffering from extreme mental or emotional disturbance, a statutory mitigator.

At trial, Dr. Regnier testified at length about Whitfield's childhood and upbringing. Dr. Regnier began his testimony on Whitfield's childhood:

> [T]his world I'm about to describe is not one that we easily see and it's very difficult for me to describe, even though I have a lot of firsthand knowledge of it.

> It is not a world that one wants to remember and America doesn't like to remember . . . . We like to keep it hidden and so do I. Any of us who gets out of this world wants to forget it.

> It is a world where nothing is permanent. It is a world of fear. It is a world of hunger. It is a world of psychological and spiritual hunger. It is a world of isolation and loneliness. It is a world of parents, the adults in our world are dysfunctional. They don't nurture. They don't feed.

> In fact, they do the opposite. They hurt. They inflict physical, emotional and spiritual harm in children.

> Q: Did you discover this in Mr. Whitfield's early childhood?

48

> A: This is exactly the world he comes from.
>
> Q: And was that at the hands of his father or his mother?
>
> A: This is at the hands of every adult in his life. It's not just the mother or the father. It's every adult that this young man comes in contact with as a child.
>
> His father never accepted him as a son.

Dr. Regnier proceeded to describe a very difficult childhood where Whitfield's father repeatedly beat him and his mother. He described Whitfield's earliest memory as one of "his father holding a gun after beating his mother to a bloody pulp, holding a gun to her head and threatening to shoot her, and Ernest [Whitfield]." Dr. Regnier also described Whitfield's impoverished surroundings, how the children in the family sometimes went hungry, and how Whitfield was hospitalized as a child because of an infection caused by worms.

Whitfield cannot establish prejudice. Any testimony Atkins could have provided in Whitfield's defense would have been cumulative to that provided by Dr. Regnier. As discussed above, trial counsel are not ineffective for failing to present cumulative evidence. *See Marquard*, 850 So. 2d at 429-30 ("[C]ounsel is not required to present cumulative evidence."). Furthermore, Atkins's testimony would only have added to the nonstatutory mitigating circumstance of Whitfield's impoverished background. The sentencing court found no statutory mitigators but considered the following nonstatutory mitigating circumstances:

> [C]ooperation with authorities (little or no weight); impoverished background (considerable weight); crack cocaine addiction (substantial weight); Whitfield's abandonment by his father and his mother's alcoholism (some weight); and that Whitfield was the victim of a near fatal shooting but forgave his assailant (little or no weight).

*Whitfield*, 706 So. 2d at 3. The court, therefore, considered all of the nonstatutory mitigation that could have been provided by the additional witnesses. In light of the three strong aggravators in this case, "prior violent felonies (two prior aggravated batteries and contemporaneous sexual battery of another victim in this case); commission in the course of a burglary; and that the murder was heinous, atrocious, or cruel," the sentence would not have

been different had the sentencing court given more weight to the nonstatutory mitigators. Id.

Whitfield also claims that trial counsel should have called Whitfield's mother, Leola Rich. As previously discussed, trial counsel had strategic reasons for not calling Whitfield's family members to the stand. According to counsel's judgment, Rich would not have made a good witness because she was, among other things, "inarticulate" and a poor historian.  Furthermore, Rich appeared at Whitfield's trial in a state of visible intoxication. Counsel had good strategic reasons for not calling Rich to testify. There was no deficient performance or prejudice because of counsel's failure to call Rich to the stand.

Whitfield also claims that trial counsel should have discovered and presented William Peterson as a witness at the penalty phase. Peterson was Whitfield's employer at the time of the murder. Peterson testified at the evidentiary hearing that Whitfield was a good worker who never had any disciplinary problems, was always on time or early for work, and never missed work. Trial counsel could not recall if Peterson had been specifically mentioned in the investigation but he did recall that he had discussed Whitfield's employment history with the investigator and with other persons who had knowledge and had specifically chosen not to call any witnesses on this issue. Peterson's testimony could have been relevant as nonstatutory mitigation. However, such testimony would be inconsistent with the defense's theory that Whitfield was a severe crack cocaine addict and would disappear for days at a time. Defense counsel made a reasonable strategic decision not to present evidence of Whitfield's employment history. Furthermore, counsel's failure to present the testimony of Peterson does not undermine our confidence in the outcome of this case considering the strong aggravating factors found by the trial court. *See Strickland*, 466 U.S. at 694 (To establish prejudice, "[t]he defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome.").

> [FN9] Dr. Regnier testified that Whitfield had flashbacks and was extremely paranoid that his assailants were going to find him and shoot him again.

*Whitfield*, 923 So. 2d at 385-87.

Petitioner raised the claim regarding counsels' failure, during the penalty phase, to present evidence that Petitioner was under the influence of drugs and alcohol at the time of the offense in Claim XII of his amended motion to vacate (Resp. Ex. C-2 at record pp. 296-99).  In denying this claim, the state post conviction court stated:

> Lastly, Whitfield alleges ineffective assistance of counsel at the penalty phase for failing to present evidence that Whitfield was under the influence of controlled substances and alcohol at the time of the offense, which would have established statutory mitigators. As set forth above, LaRue testified at Whitfield's trial, and defense counsel explained their strategic decision not to call Miller and Giles to testify; therefore, Whitfield is not entitled to relief.
>
> While Whitfield's postconviction motion alleged that Mash would provide testimony concerning additional mitigating evidence not presented during the penalty phase, the Court finds that she did not specifically identify any statutory or nonstatutory mitigators that could have been set forth but were not. Judge Rapkin further made the following findings concerning Whitfield's substance abuse in the final sentencing order:
>
>> "I believe that the defendant is a cocaine addict, and that he probably did use cocaine some time shortly before the murder."
>>
>> "The defendant suffered from chronic crack cocaine addiction."
>
> Whitfield had the burden of demonstrating that "but for counsel's errors he would have probably received a life sentence." *Rose v. State*, 675 So.2d 567, 570 (Fla. 1996). He failed to meet this burden. Whitfield is not entitled to relief on these claims. *See Occhicone v. State*, 768 So.2d 1037 (Fla. 2000); *Rutherford v. State*, 727 So.2d 216, 224-25 (Fla. 1998).

(Resp. Ex. C-5 at record pp. 871-72).

In affirming the denial of this claim, the Florida Supreme Court stated:

> Dr. Mash's testimony does not establish that trial counsel were ineffective. Trial counsel made a reasonable choice based on available information not to obtain a toxicology expert. Further, Dr. Mash's testimony does not indicate that, had a urine sample been taken, an accurate reading of

the level of cocaine in Whitfield's body at the time of the murder would have been established. Her testimony merely confirms what Dr. Regnier's testimony, along with other lay witnesses and police testimony, established at trial-that at the time of the murder Whitfield was under the influence of crack cocaine. The trial court recognized this in its sentencing order. Whitfield cannot establish deficient performance or prejudice on this issue.

*Whitfield*, 923 So. 2d at 383-84.

## A.     Failure to call lay witnesses during penalty phase

During the state post conviction evidentiary hearing, defense counsel testified that after interviewing Plaintiff's family members, Rich and Giles, they decided not to call them as witnesses (Resp. Ex. C-9 at pp. 81; Ex. C-11 at p. 428).  Counsel believed that Rich and Giles were "not good historians[,]. . .inarticulate[,]. . .not. . .sympathetic witnesses[,]. . .[and] would not have helped Mr. Whitfield."  (Resp. Ex. C-11 at p. 428).  Further, Rich appeared impaired by alcohol during the course of the trial (Resp. Ex. C-9 at p. 80), and counsel were concerned about how Rich and Giles would testify on cross examination (Resp. Ex. C-11 at p. 428).  Counsel decided not to call Miller because she had been the victim of a crime Petitioner had committed against her, and her testimony would have negatively impacted Petitioner's case (Resp. Ex. C-9 at p. 80-81; Ex C-11 at p. 392).  Counsel decided to develop the penalty phase of the case and present Petitioner's background through Dr. Regnier (Resp. Ex. C-9 at p. 81; Ex. C-11 at p. 428).  Counsels' opinion was that Dr. Regnier had "an excellent rapport. . .with jurors."  (Resp. Ex. C-9 at p. 81).  Counsel believed "that Dr. Regnier could present [Petitioner's background] in a much more articulate, convincing, firmer manner" than Petitioner's family could present (Resp. Ex. C-11 at p. 428).

Trial counsel has broad discretion in determining strategy, and in deciding which witnesses to investigate and call. *Chandler v. United States*, 218 F.3d 1315 n.16, n.17. "[C]ounsel cannot be adjudged incompetent for performing in a particular way in a case, as long as the approach taken 'might be considered sound trial strategy.'" *Id*. at 1314 (quoting *Darden v. Wainwright*, 477 U.S. 168, 186-87 (1986). Here, a reasonable attorney may have concluded that these witnesses were not helpful to, and in fact may harm, Petitioner's case, and that Dr. Regnier's testimony regarding Petitioner's background would be better received by the jury. Therefore, Petitioner has not shown that the state courts' application of *Strickland*'s deficiency prong was objectively unreasonable.

With regard to Ford, the state post conviction court found that counsel was not deficient in failing to call her because Petitioner never provided counsel with her name (Resp. Ex. C-5 at record p. 880). A state court's factual findings are presumed correct unless rebutted by clear and convincing evidence. 28 U.S.C. § 2254(e). Petitioner has presented no evidence to rebut the state court's factual finding. Nor has he shown that a reasonable investigation should have uncovered Ford. This is especially true in light of both Petitioner and his family's lack of cooperation with counsel (Resp. Ex. C-9 at p. 87, Resp. Ex. C-11 at p. 429). Therefore, Petitioner has not shown that the state courts' application of *Strickland*'s deficiency prong was objectively unreasonable.

Even if counsel should have discovered Ford, the state post conviction court found that Petitioner failed to demonstrate any prejudice in his counsels' failure to call her as a witness. During the post conviction evidentiary hearing, Ford testified that beginning in

53

1983, she was Petitioner and Rich's next door neighbor (Resp. Ex. C-11 at p. 382). Rich would babysit for her at times, and she was over at Rich's apartment almost every day (Id.). Sometimes she would see Petitioner come home looking as if he had been out all night, and he appeared sad (Id. at pp. 382-83). She would see this happen "every now and then." (Id. at p. 383). One time she saw Petitioner and thought he was high on drugs, and he became angry and broke a window by kicking it (Id.). On another occasion she saw Petitioner angry with his stepfather, and he "busted him in the mouth." (Id.). Those were the only two occasions on which Ms. Ford stated she saw Petitioner when she thought he was high on drugs (Id.). On one occasion she picked Petitioner up in an area where it was known that drugs were sold. (Id.). When she picked him up, she thought he was "a little high." (Id. at p. 384). Finally, Ford testified that there were periods of time when Rich was unable to care for Ford's child because Rich was drinking alcohol excessively (Id. at pp. 384-85).

During the penalty phase of the trial, Dr. Regnier testified that Petitioner had been using crack cocaine for nine years, and was used to smoking from one hundred to five hundred dollars worth of crack cocaine per day (see Resp. Ex. A-10 at p. 1610). Dr. Regnier stated that Petitioner's addiction to crack cocaine was so severe the he would go without sleep or food for days in order to use cocaine (Id. at pp. 1613-14). He also testified that during the period just prior to the murder, Petitioner's drug habit increased dramatically, and he was living "a life of a nomad, going from place to place, foraging for cocaine." (Id. at p. 1614).

With regard to Rich's alcohol abuse, Dr. Regnier testified that Rich "abus[ed] alcohol as a way to satisfy her own needs that is [sic] not being met by the people in her life." (Id. at p. 1594), that she was "an alcoholic," (Id. at p. 1599), and that "most of the time. . .she's intoxicated[,]. . .she's drinking." (Id. at 1623).

At best, Ford's testimony was merely cumulative to Dr. Regnier's testimony regarding Rich's alcohol abuse, and Petitioner's drug use.[9] Therefore, the state court's determination that counsels' failure to call Ford during the penalty phase did not prejudice Petitioner was not an unreasonable one. *See Wong v. Belmontes*, 558 U.S. 15, 23 (2009) (*per curiam*) (petitioner failed to establish prejudice when the additional mitigating evidence that counsel failed to introduce was cumulative with the mitigation evidence that had been presented to the jury); *Rose v. McNeil*, 634 F.3d 1224, 1243 (11th Cir. 2011) ("Obviously, a petitioner cannot satisfy the prejudice prong of the *Strickland* test with evidence that is merely cumulative of evidence already presented at trial.").

Likewise, Atkins' testimony was cumulative to Dr. Regnier's testimony. The Florida Supreme Court concluded that Petitioner did not establish prejudice as a result of counsels' failure to call Atkins because "[a]ny testimony Atkins could have provided in Whitfield's defense would have been cumulative to that provided by Dr. Regnier" regarding "Whitfield's impoverished background." *Whitfield*, 923 So. 2d at 386.

---

[9]In light of Ford's testimony that she only saw Petitioner "high" on a few occasions, it could be argued that Ford's testimony may have weakened Dr. Regnier's testimony that Petitioner was a severe crack addict for nine years.

55

During the post conviction evidentiary hearing, Atkins testified that prior to his serving as a city commissioner, he was a social worker who worked with Petitioner and his family (Resp. Ex. C-11 at pp. 317-49). Atkins testified about Rich's alcohol abuse, and implied that she essentially prostituted herself by having relationships with multiple men in order to get money. He also testified that Rich was rarely there to take care of the children. Atkins further testified regarding the impoverished conditions that Petitioner lived in as a child. The neighborhood was a dumping ground for garbage, and drugs were commonly sold there. Petitioner's apartment was in very poor condition. The family was on welfare and always short of money. Atkins called Petitioner's family "the most dysfunctional" he had ever seen (Id. at p. 335).

As previously noted, Dr. Regnier testified during the penalty phase with regard to Rich's abuse of alcohol. And, he testified that Rich had neglected Petitioner as a child by failing to feed and nurture him, and by abandoning him (Resp. Ex. A-10 at pp. 1593, 1599, 1607). Although he never directly testified that Rich prostituted herself for money, Dr. Regnier did imply that Rich was with several different men in order to get money to survive (Id. at p. 1594). Dr. Regnier testified as to Petitioner's impoverished childhood, including the poor condition of his home and neighborhood (Id. at pp. 1600-02). Dr. Regnier testified that the children used old tires and refrigerators as toys, several children would sleep together on one mattress, and that there would usually be little food in the refrigerator (Id.). He also testified that as a result of the impoverished conditions and lack of hygiene in the house, Petitioner was hospitalized with "the worst case [of worms] that was ever seen." (Id. at

1602).  Notably, Dr. Regnier not only testified regarding the poverty, abandonment, and emotional abuse during Petitioner's childhood, he also testified that Petitioner and Rich suffered severe physical abuse at the hands of Petitioner's father (Id. at p. 1595-96).

Moreover, even without Atkins' testimony, the sentencing court still found and gave weight to the nonstatutory mitigating factors of, *inter alia*, impoverished background (considerable weight), crack cocaine addiction (substantial weight), and Petitioner's abandonment by his father and his mother's alcoholism (some weight).

In sum, the Florida Supreme Court's determination that Atkins' testimony was cumulative to Dr. Regnier's testimony and therefore that Petitioner did not establish prejudice as a result of counsels' failure to call Atkins to testify during the penalty phase, was not objectively unreasonable.

With respect to William Peterson, he testified during the post conviction evidentiary hearing that he was Petitioner's former employer in 1994 and 1995 (Resp. Ex. C-11 at p. 378).  He stated that Petitioner was a good worker, never had any disciplinary problems, and was always on time for work (Id. at pp. 378-79).

Defense counsel undertook a deliberate and reasonable strategy to present and emphasize the negative aspects of Petitioner's upbringing, i.e., the poverty, neglect, abuse, and abandonment, and his crack cocaine addiction as mitigating evidence.  Counsel investigated Petitioner's employment history, but chose not to call any witnesses to testify about that history (Resp. Ex. C-9 at pp. 87-88).  Peterson's testimony regarding Petitioner's stellar employment history would have been wholly inconsistent with the strategy to present

Petitioner as a severe crack cocaine addict who would disappear for days at a time. Moreover, Dr. Regnier did briefly testify that there were signs of hope for Petitioner because despite his cocaine addiction, there were brief periods when Petitioner had a job, made and saved money, and was able to pay his bills (Resp. Ex. A-10 at p. 1615). Therefore, the Florida Supreme Court's determination that defense counsel made a reasonable strategic decision not to present evidence of Petitioner's employment history, and that counsels' failure to present the testimony of Peterson did not undermine its confidence in the outcome of the penalty phase in light of the strong aggravating factors found by the trial court, was not an unreasonable one.

Finally, Peggy LaRue testified during the post conviction evidentiary hearing that on the morning of the murder, after Petitioner had killed the victim, Petitioner came to her house and said "I killed her. I killed her." LaRue believed Petitioner was high on drugs at that time because his eyes were glossy, he was agitated, hyperactive, and talkative, and in her prior experience with Petitioner that was the way he appeared and acted when he was high on drugs (Resp. Ex. C-11 at pp. 385-88). Petitioner argues that LaRues's testimony would have corroborated Petitioner's statements that he was under the influence of drugs at the time of the murder. He further argues that LaRue's testimony would have established that Petitioner's cocaine addiction was apparent and noticeable to those people familiar with his demeanor.

During the penalty phase of the trial, Dr. Regnier testified that Petitioner had informed him that he had used cocaine just before going into the victims' house (Resp. Ex. A-11 at pp.

1610, 1621).  Moreover, he testified that his conclusion that Petitioner had been using drugs the morning of the murder was based not only on Petitioner's statements to him, but also on LaRue's deposition and guilt phase trial testimony (Id. at pp. 1625, 1639).  Finally, in the sentencing order the trial court found in pertinent part that Petitioner "probably did use cocaine some time shortly before the murder." (Resp. Ex. A-13 at record p. 2112).  Therefore, Petitioner fails to show that he was prejudiced by counsels' failure to call LaRue to testify during the penalty phase of the trial.  Consequently, the second prong of the *Strickland* analysis is not satisfied, and Petitioner was not deprived of his Sixth Amendment rights.

**B.      Failure to adequately investigate Petitioner's mental health history**

To the extent Petitioner's claim is that counsel were ineffective in failing to adequately investigate Petitioner's juvenile history because an adequate investigation would have revealed Atkins, Petitioner has not established prejudice.  As previously noted, neither Atkins nor any of the uncalled mitigation witnesses provided any substantial testimony which was not already presented by Dr. Regnier.  Further, Atkins testified predominately regarding Petitioner's impoverished background, and Rich's neglect of Petitioner as a result of her alcohol abuse.  Even without Atkins' testimony, however, the trial court gave considerable weight to Petitioner's impoverished background, and some weight to Rich's alcoholism.

To the extent Petitioner contends that Dr. Mash could have "provided evidence of statutory mitigators," the claim is vague and conclusory because Petitioner has neither specified the statutory mitigators Dr. Mash could have established, nor the evidence that

59

would have supported them.  Vague and conclusory claims failing to state facts which would demonstrate an entitlement to relief can be dismissed without further consideration. *Blackledge v. Allison*, 431 U.S. 63 (1977); *see also Tejada v. Dugger*, 941 F.2d 1551, 1559 (11th Cir. 1991) (recognizing that vague, conclusory, speculative, or unsupported claims cannot support a claim of ineffective assistance of counsel).

Petitioner further appears to contend that Dr. Mash could have established the non-statutory mitigator that Petitioner had brain damage as a result of crack cocaine abuse (see Resp. Ex. C-11 at p. 217).  Dr. Regnier testified, however, that Petitioner was sent to Dr. Negroski for a neurological examination, and Dr. Negroski found no indication of brain injury (Resp. Ex. C-9 at pp. 155-56).  The fact that Petitioner, in his state post conviction proceedings, hired an expert willing to testify that he had brain damage does not establish any deficiency in trial counsels' performance. *See, e.g., Horsley v. State of Alabama*, 45 F.3d 1486, 1495 (11th Cir. 1995) ("That experts were found who would testify favorably years later is irrelevant.").

Finally, Petitioner asserts that Dr. Fisher "found the existence of the statutory mitigator that Mr. Whitfield was under the influence of extreme mental or emotional mental disturbance at the time of the murder." (Dkt. 1 at pp. 40-41).  Dr. Fisher testified during the state post conviction evidentiary hearing that as a result of "the combination of his drug addiction and the paranoia or postraumatic [sic] stress disorder," Petitioner was under the influence of extreme mental or emotional disturbance at the time of the offense (Resp. Ex. C-11 at p. 298).  During the penalty phase of the trial, Dr. Regnier gave his opinion that

Petitioner was under the influence of extreme mental or emotional disturbance at the time of the offense as a result of Petitioner's long-term drug dependence, posttraumatic stress disorder, and major depression (Resp. Ex. A-10 at pp. 1589-90; 1609, 1617). Therefore, Dr. Fisher's opinion as to the existence of the statutory mitigator would have been merely cumulative to Dr. Regnier's opinion.

## C.   Conclusion

When evaluating this claim, this Court must consider "'whether counsel reasonably investigated possible mitigating factors and made a reasonable effort to present mitigating evidence to the sentencing court.'" *Stewart v. Secretary, Dept. of Corrections*, 476 F.3d 1193, 1209 (11th Cir. 2007) (quoting *Henyard v. McDonough*, 459 F.3d 1217, 1242 (11th Cir. 2006)). Counsel is deficient when he "'totally fails to inquire into the defendant's past or present behavior or life history' in a capital case. . . ." *Lynd v. Terry*, 470 F.3d 1308, 1317 (quoting *Housel v. Head*, 238 F.3d 1289, 1294 (11th Cir. 2001)).

"To determine prejudice from the unreasonable failure to investigate and present favorable and/or mitigating evidence, '[federal courts] reweigh the evidence in aggravation against the totality of available mitigating evidence.'" *Ward v. Hall*, 592 F.3d 1144, 1165 (11th Cir. 2010) (quoting *Wiggins v. Smith*, 539 U.S. 510, 534 (2003)). This Court must "evaluate the totality of the available mitigation evidence — both that presented at trial and at the collateral proceedings." *Id*. (citing *Williams v. Taylor*, 529 U.S. 362, 397-98 (2000)). "If 'the available mitigating evidence, taken as a whole, 'might well have influenced the

jury's appraisal of [the defendant's] moral culpability, *Wiggins*, 539 U.S. at 538, then prejudice has been shown." *Id.*

The record demonstrates that defense counsel conducted a reasonable investigation into potential mitigating evidence, and made a reasonable effort to present mitigating evidence during the penalty phase of the trial. And, Petitioner has not demonstrated that he was prejudiced by counsels' failure to further investigate or present additional mitigating evidence. Three statutory aggravators were found to exist: 1) that Petitioner had previously been convicted for a felony involving the use or threat of violence; 2) the murder was committed while Petitioner was engaged in a burglary; and 3) that the capital felony was especially heinous, atrocious, or cruel (Resp. Ex. A-13 at record pp. 2109-2110). This is not a case where the aggravating circumstances were weak, and where the jury heard very little mitigating circumstance evidence. The jury heard evidence regarding Petitioner's long history of poverty, neglect, abandonment, drug abuse, and emotional and physical abuse. *See Rutherford v. Crosby*, 385 F.3d 1300, 1315, 1315-16 (11th Cir. 2011).

Moreover, the jury heard how Petitioner first raped Willie Mae Brooks and then went into a different room and murdered Claretha Reynolds. In cases involving murders accompanied by rape, the Eleventh Circuit has found that "the aggravating circumstances of the crime outweigh any prejudice caused when a lawyer fails to present mitigating evidence." *Dobbs v. Turpin*, 142 F.3d 1383, 1390 (11th Cir. 1998).

In sum, when considering the totality of the available mitigation presented at trial and in the state post conviction proceedings and re-weighing it against the substantial evidence

in aggravation, Petitioner has not established that a reasonable probability exists that he was prejudiced by counsels' failure to present additional lay witness and expert testimony during the penalty phase.

Petitioner has not met his burden of demonstrating that the Florida Supreme Court's denial of this claim was an unreasonable application of clearly established federal law as determined by the Supreme Court within the meaning of 28 U.S.C. § 2254(d).  Therefore, Ground III will be denied.

**Ground IV**

"MR. WHITFIELD WAS DENIED THE EFFECTIVE ASSISTANCE OF COUNSEL AT THE SENTENCING PHASE OF HIS TRIAL, IN VIOLATION OF THE SIXTH, EIGHTH, AND FOURTEENTH AMENDMENTS FOR FAILING [sic] REQUEST A SPECIAL JURY INSTRUCTION PURSUANT TO *SIMMONS*.  COUNSEL'S PERFORMANCE WAS DEFICIENT AND AS A RESULT THE DEATH SENTENCE IS UNRELIABLE.  ADJUDICATION OF THE CLAIM RESULTED IN A DECISION THAT WAS CONTRARY TO, OR INVOLVED AN UNREASONABLE APPLICATION OF CLEARLY ESTABLISHED FEDERAL LAW AND/OR RESULTED IN A DECISION THAT WAS BASED ON AN UNREASONABLE DETERMINATION OF THE FACTS IN LIGHT OF THE EVIDENCE PRESENTED."  (Dkt. 1 at pgs. 43-44).

Whitfield complains that trial counsel was ineffective during the penalty phase of the trial in failing to request a special jury instruction pursuant to *Simmons v. South Carolina*, 512 U.S. 154 (1994).  *Simmons* holds that where a defendant's future dangerousness is at issue, and state law prohibits his release on parole, due process requires that the sentencing jury be informed that the defendant is parole ineligible.  512 U.S. at 156.

Whitfield raised this claim in grounds VIII, IX, and X of his Rule 3.850 motion (Resp. Ex. C-2 at record pp. 291-94). The state post conviction court summarily denied this claim

(Resp. Ex. C-5 at record p. 906).   On appeal from the denial of his Rule 3.850 motion,

Petitioner raised this claim in Issue IV of his Initial Brief (Resp. Ex. C-15 at pp. 92-94).   In

affirming the state post conviction court's denial of this claim, the Florida Supreme Court

stated:

> As to issues four and five, we summarily affirm because Whitfield presents merely conclusory arguments. *See Cooper v. State*, 856 So.2d 969, 977 n.7 (Fla. 2003) (rejecting the argument that the "lower court erred in its summary denial of these claims," and finding such "speculative, unsupported argument of this type to be improper"); *see also Randolph v. State*, 853 So.2d 1051, 1063 n.12 (Fla. 2003)("[T]he purpose of an appellate brief is to present arguments in support of the points on appeal. Merely making reference to arguments below without further elucidation does not suffice to preserve issues.")(quoting *Duest v. Dugger*, 555 So.2d 849, 852 (Fla. 1990)); *LeCroy v. Dugger*, 727 So.2d 236, 240 (Fla. 1998) (upholding the summary denial of a post conviction motion because the defense alleged no facts to substantiate its conclusory claims of ineffective assistance of counsel).

*Whitfield*, 923 So. 2d at 378-379.

The Florida Supreme Court considered Whitfield's arguments in support of this claim

merely conclusory.   This Court agrees.   In one sentence, Whitfield asserted that after the jury

requested information regarding whether Whitfield would ever be released from prison if he

was given a life sentence,[10] "[c]ounsel and the court failed to give a proper instruction,

violating the dictates of *Simmons* and its progeny." (Resp. Ex. C-15 at pp. 93-94).   Whitfield

did not articulate or even suggest the special jury instruction counsel should have requested.

---

[10]During deliberations after the penalty phase of the trial, the jury posed the following question to the trial court: "Does life in prison without parole really mean 'no parole' under any circumstances.  He will never be allowed back into society again?"  (Resp. Ex. A-10 at pp. 1701-02) (emphasis in original).

The Florida Supreme Court's decision was reasonable inasmuch as Petitioner's allegations were general, vague, and conclusory, with no showing of prejudice.[11]  *See Tejada v. Dugger*, 941 F.2d 1551, 1559 (11th Cir. 1991) (noting that a petitioner is not even entitled to an evidentiary hearing as to federal habeas corpus relief when the "claims are merely conclusory allegations unsupported by specifics or contentions that in the face of the record are wholly incredible") (quotations and citation omitted).

Further, counsel did not perform deficiently.  In *Shafer v. South Carolina*, 532 U.S. 36 (2001), the Supreme Court reaffirmed *Simmons* and held that "whenever future dangerousness is at issue in a capital sentencing proceeding. . .due process requires that the jury be informed that a life sentence carries no possibility of parole."  *Id*. at 51.  During the penalty phase of the trial, the jury was instructed in pertinent part that "[t]he punishment for this crime is either death or life imprisonment without the possibility of parole."  (Resp. Ex. A-10 at p. 1525).  Moreover, during penalty phase closing argument, counsel repeatedly informed the jury that a sentence of life without the possibility of parole meant that Petitioner would "die in prison" and that "[h]e's never getting out of prison."  (Id. at pp. 1674-75, 1690-91).  Therefore, the jury was properly informed, as required by *Simmons* and *Shafer*, that Petitioner's life sentence carried no possibility of parole.

---

[11]To the extent Petitioner now asserts, not only for the first time in habeas review, but in his reply rather than his petition, that "had the jury been instructed that parole had been abolished, that Mr. Whitfield had no other avenue to seek release from prison, and that he would die in prison if he were sentenced to life, the jury may well have reached a different verdict"  (see Dkt. 78 at p. 40), the assertion is unexhausted and procedurally defaulted. Consequently, the Court will not consider this additional assertion.

Finally, after the jury posed its question, defense counsel asked the court to "either instruct them that yes, it means life imprisonment without parole and he would not be released, or, at the very minimum, that you reread the pertinent portion of the jury instructions that says life without the possibility of parole." (Id. at p. 1704). The court responded that "I'm not going to say yes, that that means that he can never get out, because - - I'm not going to say that because I don't know." (Id. at 1705). Therefore, defense counsel attempted to have the court specially instruct the jury that the life sentence meant that Petitioner would not be released from prison, i.e., "never be allowed back into society again," but the court refused to do so.

Petitioner has failed to demonstrate that the Florida Supreme Court's denial of this claim was contrary to, or involved an unreasonable application of, clearly established Supreme Court law, or was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding. Accordingly, Ground IV does not warrant relief.

**Ground V**

"MR. WHITFIELD WAS DENIED HIS RIGHTS UNDER *AKE V. OKLAHOMA* AT THE GUILT AND PENALTY PHASE [sic] OF HIS TRIAL WH-N [sic] COUNSEL FAILED TO ENSURE THAT THE DEFENDANT OBTAIN AN ADEQUATE MENTAL HEALTH EXAMINATION BY FAILING TO PROVIDE THE NECESSARY TIME AND INFORMATION TO THE MENTAL HEALTH EXPERT" (Dkt. 1 at pp. 45-47).

In Ground V of the petition, Petitioner asserts that he was denied his right to adequate mental health assistance under *Ake v. Oklahoma*, 470 U.S. 68 (1985). In the response, Respondent correctly asserts that this claim is procedurally barred (see Dkt. 64 at p. 134), as

the Florida Supreme Court held that the claim was procedurally defaulted because it could

have been raised on direct appeal and was not.  *See Whitfield*, 923 So. 2d at 379.  Petitioner

has not shown cause for the procedural default.  Nor does he show that he is actually

innocent of the death penalty, as explained in *Sawyer v. Whitley*, 505 U.S. 333, 346-47

(1992).  *See Cade v. Haley*, 222 F.3d 1298, 1308 (11th Cir. 2000) ("*Sawyer* excuses

procedural default . . . when a petitioner shows by clear and convincing evidence that, but

for a constitutional error, no reasonable juror would have found the petitioner eligible for the

death penalty under the applicable state law.") (quotations omitted).

Even if the claim were not barred from review, it would fail on the merits.  In *Ake*, the

Supreme Court held that:

> When a defendant demonstrates to the trial judge that his sanity at the time of
> the offense is to be a significant factor at trial, the State must, at a minimum,
> assure the defendant access to a competent psychiatrist who will conduct an
> appropriate examination and assist in evaluation, preparation, and presentation
> of the defense. This is not to say, of course, that the indigent defendant has a
> constitutional right to choose a psychiatrist of his personal liking or to receive
> funds to hire his own. Our concern is that the indigent defendant have access
> to a competent psychiatrist for the purpose we have discussed, and as in the
> case of the provision of counsel we leave to the State the decision on how to
> implement this right.

*Id*. at 83.  Respondent correctly argues that Petitioner cannot establish an *Ake* violation

because Petitioner has failed to allege or show that the state trial court denied a request he

made for mental health assistance (Id.).  *See Clisby v. Jones*, 960 F.2d 925, 930 (11th

Cir.1992) (en banc); *Provenzano v. Singletary*, 148 F.3d 1327, 1333-34 (11th Cir. 1998)

("*Clisby* holds that *Ake* is a due process doctrine, which requires the petitioner in all but the

most unusual circumstances to show that he requested from the trial court something in the way of mental health expert assistance that the trial court refused to give him.") (citation omitted).

In Petitioner's reply to Respondent's response, he appears to recharacterize this claim as ineffective assistance of counsel based upon counsel's failure to provide "Dr. Regnier...with the materials, information, and time that he needed in order to be prepared for trial." (Dkt. 78 at p. 41). Petitioner presented this or a similar claim to the state post conviction court in Claim XVI of his Rule 3.850 motion (Resp. Ex. C-2 at record pp. 302-03). In denying this claim, the state post conviction court stated:

> Claim sixteen alleges a violation of *Ake v. Oklahoma*, 470 U.S. 68 (1985), due to ineffective assistance of counsel for failure to ensure that Whitfield received an adequate mental health examination by failing to provide the necessary time and information to the mental health expert.
>
> After reviewing the record and upon consideration of testimony presented at the evidentiary hearing, the Court finds that Whitfield failed to communicate with his trial attorneys and Dr. Regnier. Whitfield's failure to communicate and cooperate, [FN 60] along with the dysfunctional nature of his family, led to defense counsel's failure to discover additional mitigating evidence, such as Whitfield's relationship with Fredd [sic] Atkins. Case law provides that "the reasonableness of counsel's actions may be determined or substantially influenced by the defendant's own statements or actions." *See Stewart v. State*, 801 So.2d 59, 67 (Fla. 2001). Defense counsel pursued leads provided by Whitfield and his family; however, defense counsel's performance was hindered by Whitfield's lack of cooperation. *See Stewart v. State*, 801 So.2d 59 (Fla. 2001). Claim sixteen is denied.
>
> [FN 60] Dr. Regnier testified that he could not answer whether Whitfield could possess a premediated design to effect the murder of Ms. Reynolds "because [he] could not get the kind of data from the defendant that [he] need[ed] to make such a determination." (R. 1221). Dr. Regnier agreed that Whitfield

would not cooperate by taking tests Dr. Regnier wanted to administer.  (R.
1226: 1240).

(Resp. Ex. C5 at pp. 881-82).

The Florida Supreme Court, in affirming the state post conviction court's denial of this claim, stated that "Insofar as [Issue Six] alleges ineffective assistance of counsel for failing to pursue an *Ake* claim, Whitfield has failed to show either deficient performance or prejudice." *Whitfield*, 923 So. 2d at 379.

The state post conviction court found that counsel's performance was not deficient because it was Petitioner's lack of cooperation, not counsel' failure to provide Dr. Regnier with sufficient time and information, that prevented Dr. Regnier from making a diagnosis of whether Petitioner could possess a premeditated design to effect the murder of the victim. The transcript of the evidentiary hearing on Petitioner's Rule 3.850 motion supports this finding.  During the evidentiary hearing, Dr. Regnier testified that he was unable to form a definitive opinion as to whether Petitioner could have possessed the premeditated design to effect the murder because he was unable to test and obtain data from Petitioner due to Petitioner's failure to cooperate with him (Resp. Ex. C-9 at pp. 156-57).  Further, Dr. Regnier unequivocally testified that "had [Petitioner] cooperated, time would not have been an issue." (Id. at pp. 157-58).  Finally, Dr. Regnier testified in pertinent part that it was Petitioner's "strategy to be completely uncooperative, to make his attorneys look bad, to not cooperate, because these would be actions for mitigation. . . ." (Id. at p. 171).

The state courts' denial of this ineffective assistance of counsel claim was neither an unreasonable application of clearly established federal law, nor based on an unreasonable determination of the facts in light of the evidence. Accordingly, Petitioner is not entitled to federal habeas corpus relief on Ground V.

ACCORDINGLY, it is **ORDERED** that:

1. Petitioner's petition for writ of habeas corpus (Dkt. 1) is **DENIED**.

2. The Clerk is directed to enter judgment against Petitioner, terminate any pending motions, and close this case.

## CERTIFICATE OF APPEALABILITY AND LEAVE TO APPEAL IN FORMA PAUPERIS DENIED

IT IS FURTHER ORDERED that Petitioner is not entitled to a certificate of appealability. A prisoner seeking a motion to vacate has no absolute entitlement to appeal a district court's denial of his motion. 28 U.S.C. § 2253(c)(1). Rather, a district court must first issue a certificate of appealability (COA). Id. "A [COA] may issue … only if the applicant has made a substantial showing of the denial of a constitutional right." Id. at § 2253(c)(2). To make such a showing, Taylor "must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong," *Tennard v. Dretke*, 542 U.S. 274, 282 (2004) (quoting *Slack v. McDaniel*, 529 U.S. 473, 484 (2000)), or that "the issues presented were 'adequate to deserve encouragement to proceed further,'" *Miller-El v. Cockrell*, 537 U.S. 322, 335-36 (2003) (quoting *Barefoot v. Estelle*, 463 U.S. 880, 893 n. 4 (1983)). Petitioner cannot make the requisite showing in these circumstances.

Finally, because Petitioner is not entitled to a certificate of appealability, he is not entitled to appeal *in forma pauperis*.

**DONE** and **ORDERED** in Tampa, Florida on July 11, 2013.

JAMES S. MOODY, JR.
UNITED STATES DISTRICT JUDGE

SA:sfc
Copy to: Counsel of Record